FILED
JN
OCT 3 1 2007
OCT. 31, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RICHARD R. FURSTENAU, ) | |
| ) | |
| Plaintiff, ) | 07cv6143 |
| ) | JUDGE NORGLE |
| v. ) | MAG. JUDGE BROWN |
| ) | |
| CITY OF NAPERVILLE, a municipal ) | |
| Corporation; MICHAEL HULL, ) | JURY TRIAL DEMANDED |
| in his individual and official capacity; ) | |
| DAVID DIAL, in his official and individual ) | |
| Capacity; and MICHAEL CROSS, in his ) | |
| individual and official capacity, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

RICHARD R. FURSTENAU, through his attorneys, Shawn M. Collins and John A. Sopuch III of The Collins Law Firm, P.C., for his Complaint against CITY OF NAPERVILLE, OFFICER MICHAEL HULL, POLICE CHIEF DAVID DIAL, and DETECTIVE MICHAEL CROSS, states and alleges as follows:

### I.

### INTRODUCTION

> "I don't know what you mean by YOUR way,
> all ways about here belong to ME...."
> —The Red Queen, Alice in Wonderland

In January of 2006, the Naperville Police orchestrated the false arrest of their number one political enemy, Naperville City Councilman Richard R. Furstenau. During his Council tenure, Furstenau had infuriated the Police as he:

- Publicly castigated Police overtime pay practice, which has resulted in many City officers receiving overtime pay of **one-third, or more, of their base salary,** and more than **40**

**police officers** being counted among the highest-paid City employees making more than $100,000 per year.

- Tried to ban **"double-dipping"** by retired Naperville police officers, *i.e.*, the practice whereby a City police officer retires, begins collecting a City pension, and then returns to the full-time work force (at the City or elsewhere), drawing a second check.

- Loudly objected to Police use of taser guns against local citizens.

- Bluntly disagreed with the Police over their conduct which had led to citizen complaints and threats of legal action against the City.

By January of 2006, Furstenau presented an even greater threat to the Police, as he had just announced his candidacy for the Illinois State Senate where, if elected, Furstenau promised to push for police "pension reform."

With this as the backdrop, on two occasions, on New Year's Day 2006, Furstenau questioned Officer Michael Hull—both times on a public Naperville street (Chicago Avenue), both times in front of perhaps hundreds of local residents who were making their way to watch the New Year's Day Parade, and on the second occasion with one of Hull's supervisors just a few feet away—about what Furstenau believed to be Hull's improper towing of cars. Both conversations were brief and uneventful. Furstenau never hit Hull. Indeed, Hull obviously believed that Furstenau had done nothing wrong, as that day, *Hull voiced no complaint to Furstenau; never said anything to the police sergeant who was with Hull when Furstenau came back the second time to find out why cars were getting towed; filed no complaint; made no arrest; and did not even fill out the "Incident Report" customarily prepared when an officer encounters possible criminal conduct.* Further, none of the numerous citizens who were milling around on Chicago Avenue that day waiting for a parade to start complained about or reported Furstenau's conduct. And no one, not a single person of the hundreds who had come to see Naperville's New Year's Day parade, provide any support for Hull's fantastic account

2

(unveiled days later) that Furstenau, a sixty-one year old man, hit him so hard in the middle of the chest that he (Hull, a thirty-some year old police officer) was "so shocked" that he could "not immediately react." Instead, what the Naperville Police had were eyewitnesses who said that Furstenau never touched Hull.

Despite Officer Hull's dubious and uncorroborated story, and despite the fact that Hull's conduct—or more accurately, complete lack of conduct—belied Hull's account of the forceful battery by Furstenau, days later, Police Chief David Dial decided that a criminal "investigation" be undertaken, and it was. But just like Hull's ridiculous story, this investigation was a sham. *Even before it started*, the Police had concluded that they would demand felony charges of "Aggravated Battery"—which carried a potential sentence of 15 years in prison—against Furstenau. Further, in the "investigation," the Police failed to interview material witnesses, and ignored the statements of all witnesses (except Hull) who stated that they had seen no contact between Furstenau and Hull.

The investigation even featured the lead Police investigator, Detective Michael Cross (not an independent investigator, but a Naperville police officer himself), "re-interviewing" Hull for the purpose of letting his colleague know that his version of events did not jive with what other witnesses had said about key events of January 1, *and getting Hull to change his story* so that it would better mesh with the stories of the other witnesses. And, indeed, Hull did change his story.

The sham nature of this "investigation"–and resulting battery charge against Furstenau– was finally proven by the fact that Officer Hull (the lone witness claiming Furstenau had hit him) *did not even personally appear at Furstenau's trial.* Furstenau was thus acquitted of all charges, but the acquittal did not come until some 17 months after Hull had fabricated the bogus

3

charge against Furstenau, and after substantial and irreparable damage had been done to Furstenau.

The announcement of Furstenau's arrest predictably blazed across newspaper headlines, throughout Naperville and across the region which Furstenau was seeking to represent. It severely damaged Furstenau's reputation, and ruined his campaign for the State Senate, as his opponent seized on the arrest and splashed it across his own campaign literature.

This lawsuit is Richard R. Furstenau's effort to recover what has been wrongfully taken from him. It is also to call to account those within the City of Naperville and its Police Department who orchestrated Furstenau's false arrest in order to retaliate against him for exercising his constitutional right to speak out against the Naperville Police Department's pay policies and behavior.

## II.

## PARTIES

1. Plaintiff Richard R. Furstenau ("Furstenau") is, and at all relevant times has been, a resident of the State of Illinois and a Naperville City councilman.

2. Defendant City of Naperville is, and at all relevant times has been, a municipal corporation; the City of Naperville Police Department is a department within the municipal corporate structure of the City of Naperville.

3. Defendant Michael Hull is, and at all relevant times has been, acting under color of state law as an officer for the Police Department of the City of Naperville.

4. Defendant David Dial is, and at all relevant times has been, acting under color of state law as the Chief of Police for the City of Naperville.

4

5. Defendant Michael Cross is, and at all relevant times has been, acting under color of state law as an officer for the Police Department of the City of Naperville.

## III.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. § 1331 because this case arises under the laws of the United States of America, and specifically alleges violations of the Fourth and Fourteenth Amendments to the United States Constitution, brought pursuant to 42 U.S.C. § 1983.

7. This Court has supplemental jurisdiction over the Illinois state law claim set forth in Count IV, pursuant to 28 U.S.C. § 1367, as that claim involves substantially overlapping evidence and witnesses, involves the same events or connected series of events, and is otherwise so related to the Plaintiff's federal question claims that they form part of the same case or controversy under Article III of the United States Constitution.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because this case arises out of actions that occurred within this Judicial District.

## IV.

## ALLEGATIONS OF FACT

### Furstenau Has Repeatedly Angered the Police Through his Consistent Criticism of Police Pay and Practices

9. During his eight and a half year tenure as a Naperville City Councilman, and as set forth below, Furstenau has regularly inflamed both the leadership and rank-and-file of the City's Police Department, as he has repeatedly and openly accused the Police of abusive pay (particularly overtime pay) practices; criticized "double-dipping" for retired City police officers;

5

disagreed with the Police over "pet" Police projects; and opposed the Police's handling of cases of alleged Police misconduct.

### Furstenau Accuses the Police of Abuse of Regular and Overtime Pay

10. Beginning in May 1999, when he first joined the City Council, Furstenau has demanded to examine a listing of the City's 100 highest-paid employees. Furnished to him annually, this list now has a City-conferred title which associates the issue exclusively with Furstenau, *i.e.*, "Per City Councilman Furstenau's Request."

11. Nearly every year, Furstenau has noticed an increase in the number of police officers appearing on the list, to the point where, in 2006, almost half of the City's 100 highest-paid employees are members of the Police Department. Each of these police officers made more than $100,000 in 2006. Moreover, in many of these instances, the officer received overtime pay in excess of $25,000, and frequently the overtime pay amounted to 33%, or more, of the officer's total compensation. This has led to the fact that, of total 2006 overtime pay to all City employees of some $7 million, approximately $5 million of that was paid to its police officers. All of this and more has prompted Furstenau to carefully examine—and sharply criticize · how the City's police are paid, and particularly to criticize Police Department practices concerning overtime pay.

12. During this scrutiny, Furstenau has learned that the more senior officers within the Police Department have virtually unlimited access to their choice of overtime hours, at a pay rate of one and one-half times regular pay. Furthermore, he has learned that overtime pay is often "retroactively" approved, *i.e.*, approved only after it has been worked by the (typically more senior) officers, without examination in advance as to whether the overtime is reasonably required.

13.     Furstenau has been critical of these Police practices because they are expensive not only in the fiscal year in which the police overtime is paid, but also because they continue to cost the City for many years into the future. Overtime paid this year, for example, is figured into the police officer's base pay for purposes of determining his/her pension which will be paid upon the officer's eventual retirement. This has the obvious result of driving up for years into the future pension costs to the City and the taxpayers.

### Furstenau Criticizes "Double-dipping" by Retired City Police Officers

14.     Another of Furstenau's vocal and repeated criticisms of practices within the City and Police Department is that there is no prohibition against "double-dipping" by a retired City police officer. In other words, a City police officer may retire from service to the Police Department and collect a pension for past service, and at the same time re-enter the work force on a full-time basis for the City or some other municipal employer. If the retired officer does so, then he or she is permitted to receive two checks from the City, *i.e.*, one for the pension, and the other for the subsequent job. On numerous occasions, Furstenau has objected to this practice by the City Police.

### Furstenau Disagrees with the Police over "Pet" Police Projects

*Taser "Stun" Guns*

15.     About four years ago, Furstenau began strongly objecting to the Police Department's desire to equip all of its officers with taser "stun" guns. Having seen reports from around the country regarding citizens who had been killed or severely injured as a result of being shot with police taser guns, and concerned about the possibility of taser gun misuse by the Naperville Police, Furstenau did not want City police to have such guns, and said so repeatedly and vocally at, among other forums, City council meetings. His strongest concern centers on

individuals who are shot multiple times by a taser gun—because that is where the highest incidence of fatalities occurs.

16.     Furstenau lost this dispute with the Police, and, as a result, many, if not all, of the City's police officers now have taser guns.

17.     Nevertheless, Furstenau continues to closely monitor for possible taser gun abuse by City police, and continues to object to the police having them. His monitoring includes his requesting, and reviewing, data on the Police Department's use of tasers. In this work, Furstenau has uncovered—and voiced concern over—what he considers to be a disturbing increase in the number of times that City police officers have shot citizens with taser guns multiple times.

*Police-directed Towing*

18.     Last year, before the City entered into a new towing contract, the Police Department presented the City Council with its desired version of the new contract. Furstenau was not in favor of the Police-drafted version of the contract and publicly said so. Furstenau felt the contract that the Police had drafted gave the Police far too much discretion as to which cars could be towed, who would tow these cars, and to which destination these cars would be towed.

19.     So, in an effort to reign in what he perceived as unfettered police discretion in the towing of cars, Furstenau and other City Council members revised the draft towing contract that the Police had presented to the City Council. This revised towing contract diminished Police discretion, while strengthening the accountability to the City of towing companies. The revised version of the contract eventually prevailed.

*Seat-belt law*

20.     Several years ago, the Naperville Police Department came to the City Council and strongly urged the passage of a City ordinance which would make it illegal to drive in or through

the City unless every occupant in a vehicle was wearing a seat-belt. Furstenau and other City Council members effectively prevented the Department from obtaining their desired seat-belt ordinance.

21. Although Furstenau strongly supported the safety concerns associated with such an ordinance, he felt that the only responsible way to address the problem was through a comprehensive, state-wide law requiring motorists to wear seat-belts, and not through piecemeal, city-by-city legislation. Furstenau and other City Council members played an important role in the state legislature's decision to pass a state-wide seat-belt law.

22. However, prior to the passing of a state-wide law, Furstenau wrangled for years with the Police during City Council meetings by openly questioning the veracity of the Police Department's concern for the safety of motorists. Furstenau suspected, and vocalized his concern, that the true motivation behind the Police's ardent support of the seat-belt law was a desire to increase police officers' ability to randomly pull over otherwise law bidding citizens. As he publicly stated, Furstenau did not want to pass an ordinance which gave the Police a blank check to sit at the border between, for example, Aurora and Naperville, selectively pulling over certain individuals under the guise of motor safety.

### Furstenau Disagrees with Police over the Department's Handling of Internal and External Allegations of Misconduct

23. The City Council typically addresses both internal and external claims of police misconduct in closed council sessions, known as "executive sessions"—the contents of which are insulated from the press and Naperville's citizens.

24. These "executive sessions" include the City Council's deliberation on settling claims of police misconduct leveled against the city. During these deliberations (of which the Police Department are fully aware) on external, as well as internal, allegations of police

9

misconduct, Furstenau has been a vocal and outspoken critic of the Department's leadership and supervision of its officers. At times, Furstenau has demanded that the Department settle claims of misconduct asserted against officers and the City that the Police strongly desired to fight in court. On several of these occasions, Furstenau has been the only member of the City Council to voice any objection at all.[1]

### The Naperville Police Bring False Charges Against Furstenau, in Retaliation for His Past Disputes with the Police, and to Derail Furstenau's State Senate Campaign

25. In late 2005, Furstenau became an even bigger threat to the Police when he decided to run for State Senator. To be sure, one of the platforms of Furstenau's Senate campaign was "police pension reform." Had he been elected to the State Senate, Furstenau publicly stated that he fully intended to pursue legislation which would prevent the previously-discussed "double dipping" that is such a lucrative practice for police officers, yet a serious drain on municipal budgets.

26. To combat this threat posed by Furstenau's run for State Senate, and to retaliate against Furstenau for his longstanding and relentless criticism of the Police, on January 18, 2006, the Police arrested Furstenau, in the absence of probable cause, and based upon fabricated charges. The arrest was based upon the false accusation that, in broad daylight on January 1, 2006, with Naperville's New Year's Day parade about to start and, thus, with hundreds of people milling around, Furstenau punched a uniformed City police officer, Defendant Michael Hull, on New Year's Day on a public street in Downtown Naperville. Furstenau did no such thing.

---

[1] Due to the confidential nature of these "executive sessions," the specific details of the disputes between Furstenau and the Police Department will not be alleged here, but rather will be disclosed as required by applicable rules and Court order.

10

27. On January 1, 2006, Furstenau was in the downtown area of Naperville, Illinois, waiting to march in Naperville's New Year's Day parade as a City Councilman. Prior to the parade, at about 4:15 to 4:30 p.m., Furstenau was walking towards the starting point of the parade, when he observed a nearby commotion. What Furstenau observed was several individuals yelling at Officer Hull, as Hull was ordering the towing of multiple vehicles located on Chicago Ave.

28. Furstenau approached Officer Hull to inquire into why the cars were being towed away. Hull responded that the cars were in a designated tow zone which, although it may have been, had not been timely identified as such. Furstenau was unsatisfied and baffled by Hull's response, and he left the scene continuing to walk towards the start of the parade.

29. Approximately twenty to thirty minutes after his brief conversation with Hull, Furstenau had a second conversation, this time with Hull and Hull's supervisor, Sergeant Steven J. Schindlbeck. Again, Furstenau asked both officers why cars on Chicago Avenue had been, and were being, towed, and when the "Do Not Park" signs had been put up. Neither Hull nor Schindlbeck could provide a satisfactory answer to either question. On neither the first nor this second occasion, did Furstenau punch Hull; nor did he touch Hull. Further, while Furstenau was standing right in front of him, at no time did Hull inform his supervisor Schindlbeck that Furstenau had, just minutes before, punched him in the middle of the chest so hard that it had "shocked" Hull. Indeed, when Schindlbeck was "interviewed" as part of the Police Department's "investigation," Schindlbeck said nothing (not a single word) about Hull punching, hitting or touching Hull.

30. After getting no answers to his questions from Hull and Schindlbeck, Furstenau left the area.

11

31.     At no time on that day did Officer Hull or Sergeant Schindlbeck complain to Furstenau about Furstenau's behavior, let alone warn state or even suggest to Furstenau that he had done anything that might subject him to arrest. Indeed, Officer Hull did not arrest Furstenau that day, and did not even hint that he might.

32.     Neither did Officer Hull prepare on that day any of the documentation required of a City police officer when that officer has concluded that criminal – or even unusual – activity may have occurred. Officer Hull on that day filed no complaint, and prepared no "Incident Report" or memorandum of any kind.

33.     Approximately four (4) or five (5) days after his interaction with Officer Hull, Furstenau learned from a fellow City Councilman that the Police were investigating him for allegedly battering Hull. This stunned Furstenau, as he knew he had done nothing of the kind, and indeed had heard no complaint from Officer Hull, any other officer or anyone concerning his behavior.

### The "Investigation" into Furstenau's Encounter with Hull was Pre-Determined to Bring Charges Against Furstenau from the Outset

34.     Obviously believing that Furstenau had committed no crime during their encounter on January 1, Officer Hull completed his shift that day, and returned home. He did not seek medical attention for any alleged physical altercation he had experienced. He did not go to Police headquarters to prepare any complaint or report as to anything unusual that may have happened that day.

35.     Nevertheless, on or about January 3, Naperville Police Chief Dial – with whom Furstenau had often had disagreements about Police matters (such as those described above) – determined that an "investigation" of Furstenau's conduct should be undertaken.

36. Accordingly, Police Chief Dial appointed Naperville Police Detective Michael Cross (whom, ironically, Dial later described to Furstenau as the Police's "best man") to head the kangaroo "investigation." Chief Dial remained in charge of the "investigation" throughout; stayed in close contact with Detective Cross concerning the investigation's progress; provided Cross with "witnesses" to interview and either approved the seeking of what he knew to be unjustified criminal charges against Furstenau at the conclusion of the "investigation," or recklessly disregarded the fact that there was no lawful basis to bring such charges. Indeed, why the sitting Chief of Police was so involved in the "investigation" into Furstenau is telling.

37. The "investigation" was a sham, calculated to bring unwarranted charges against Furstenau. This is demonstrated, *inter alia*, by the following:

(a) Even before the "investigation" began, Detective Cross and the Naperville Police Department had concluded that they would seek felony charges for "Aggravated Battery" against Furstenau. (The DuPage County States Attorney refused to bring "Aggravated Battery" charges and so, more than two weeks after the alleged battery took place, Cross and Hull personally secured from a DuPage County Judge an arrest warrant for misdemeanor charges based on a false statement which Hull signed "on oath" and which contained materially different information than what Hull had told Cross when Cross first "interviewed" Hull.)

(b) Despite the fact that Officer Hull on January 1 had plainly concluded that Furstenau had committed no crime–as he had made no arrest, filed no complaint, and prepared no "Incident Report"–on January 3, Chief Dial instructed Officer Hull and others to prepare internal memoranda of the January 1 "events." No other police officer that Dial asked to prepare an "Incident Report" saw Hull get punched, hit, or touched by Furstenau. Moreover, the senior officer to whom Hull claimed to have reported Furstenau's forceful battery did not even bother to submit an Incident Report or prepare any statement whatsoever. As of today, there is no evidence that that officer was ever even interviewed.

(c) On January 3, 5 and 6, Officer Hull wrote and told his version of the "events" of January 1. While these re-tellings by Hull were *less than one week after* the supposed battery by Furstenau–and thus, one would think that a trained professional like Officer Hull should have had his clearest memory–Officer Hull's thrice-told version described things that did not happen, and could not have happened. For example, Hull was in error by almost two hours as to the time of the alleged crime. Officer Hull three times reported that his exchange with

Furstenau occurred at 2:50, when Furstenau was nowhere near Officer Hull or even in the area where he claimed that Furstenau had punched him. Officer Hull was also in error about the downtown Naperville building from where Furstenau emerged just before the alleged "crime."

(d) These material errors should have halted any investigation, and certainly any thought of pressing felony charges. They did not. Instead, Detective Cross re-interviewed Officer Hull, and told him what other witnesses had said about the time when Furstenau and Officer Hull had briefly been together on January 1. As a result of this re-interview, Officer Hull "corrected" his version of events, and agreed to a timeline which Detective Cross had suggested to him, and described as "more consistent" with that offered by other witnesses.

(e) Of the approximately 10 witnesses interviewed in connection with the "investigation," only one–Officer Hull–stated that Furstenau had hit him. All others either denied that Furstenau had done any such thing, stated that they saw no such contact, or were otherwise unable to support the pre-determined "Aggravated Battery" charge that the police had come up with. Accordingly, the only witness alleging Furstenau had hit Officer Hull was Hull himself–who had failed to make any arrest, voice any complaint, or prepare any report of physical contact allegedly so serious and forceful that it had "shocked" Hull and constituted felony "Aggravated Battery," and who, in the three reports he subsequently offered at the behest of Chief Dial, could not even get the time right, and thus had to be told to change his story.

(f) Police Chief Dial personally invited Furstenau to be interviewed by Detective Cross in connection with the "investigation." Furstenau consented to be interviewed by Cross, and did not even bring a lawyer with him. Furstenau answered all of the Police's (and Detective Cross's) questions, including making a vigorous denial of any allegation that he had ever hit Officer Hull. However, Chief Dial did not inform Furstenau that, well before the interview, his Police Department had already decided to charge Furstenau with felony "Aggravated Battery."

(g) When asked by Detective Cross if he could provide any witness who saw what happened between Furstenau and Hull, Furstenau gave Detective Cross two names. Cross interviewed both witnesses and both (who were just a few feet from Furstenau and Hull when Furstenau allegedly punched Hull) refuted Hull's ridiculous version of events. Unbelievably, Cross, the Department's "best man" did not ask either of the witnesses whether they had seen Furstenau punch, hit or touch Hull.

38. Despite glaring holes in Officer Hull's account of the incident, despite the lack of any witness who could corroborate the alleged battery, despite the fact that Hull's account had

been refuted and despite the failure to properly interview all individuals who witnessed the "incident," on January 17, 2006 Detective Cross spoke with Assistant State's Attorney Jennifer Piccione and demanded that felony charges be brought against Furstenau. This request was denied. Undeterred, on that same day (just hours after the denial by Prosecutor Piccione), Officer Hull and Detective Cross went to Dupage County Courthouse and obtained an arrest warrant for Furstenau.

### Furstenau's Arrest Destroys His State Senate Campaign, and Badly Damages his Reputation

39. Furstenau's arrest was the death knell for his chance to win the State Senate seat. Newspaper headlines which began on January 8, 2007 with a leak from Police gave the arrest a prominence that made it impossible for Furstenau's campaign to succeed. Indeed, the first wave of articles came out before Furstenau had been charged with anything and while the "investigation" by Cross was still ongoing. The story had clearly been leaked to the press by the Police Department.

40. Furstenau's opponent made most of the headlines. The opponent's campaign literature reproduced stories of the news of Furstenau's arrest, and was circulated throughout the Senate district. The arrest was spotlighted as the reason to vote against Furstenau. To be sure, the stories about the "investigation" of Furstenau and his subsequent arrest were huge. Indeed, in its end-of-the-year edition for 2006, the Naperville Sun reported that its readers had voted the story on Furstenau's arrest as the "top story of 2006."

41. As a result, in a race where originally Furstenau had been given an excellent chance to win, he was ultimately defeated by a 60-40% margin.

42. Unfortunately the damage did not stop with the election loss. Furstenau's reputation within the Naperville community has been irreparably harmed, even despite his ultimate acquittal.

### Officer Hull Does Not Appear at Furstenau's Criminal Trial; Furstenau is Acquitted

43. As the final proof that the charges against Furstenau were false, the only witness claiming Furstenau had hit Officer Hull–Hull himself–failed to appear in person at Furstenau's criminal trial.

44. The DuPage County Judge presiding over the criminal case found Furstenau not guilty of the battery that Hull had fabricated.

### Count I

### 42 U.S.C. § 1983 – U.S. Const., Amend. IV Violation

45. Plaintiff, repeats, re-alleges, and incorporates by reference paragraphs 1 through 44 as if fully set forth herein.

46. Defendants Michael Hull, Detective Michael Cross, Chief David Dial, and the City of Naperville are "persons" as that term is used in 42 U.S.C. § 1983.

47. Plaintiff was arrested and detained by Defendants without probable cause, in violation of his Fourth and Fourteenth Amendment rights.

48. Defendants, acting under color of state law, proximately caused the deprivation of Plaintiff's Fourth Amendment rights.

49. Defendants' actions were undertaken either with the intent to deprive Plaintiff of his rights, or with reckless and callous disregard for, and deliberate indifference to, Plaintiff's constitutional rights.

50. Defendant City of Naperville acted pursuant to an official policy, custom, or decision of an individual with final policy-making authority, and proximately caused the deprivation of Plaintiff's Fourth Amendment rights.

### Count II

### 42 U.S.C. § 1983 – U.S. Const., Amend. XIV Violation

51. Plaintiff, repeats, re-alleges, and incorporates by reference paragraphs 1 through 50 as if fully set forth herein.

52. Defendants Michael Hull, Detective Michael Cross, Chief David Dial, and the City of Naperville are "persons" as that term is used in 42 U.S.C. § 1983.

53. Plaintiff was arrested by Defendants without probable cause.

54. In arresting Plaintiff without probable cause, Defendants intentionally treated Plaintiff differently from others similarly situated, in violation of Plaintiff's Fourteenth Amendment right to equal protection under the law.

55. Defendants' differential treatment of Plaintiff was without rational basis, or based upon Defendants' wholly illegitimate animus toward Plaintiff.

56. Defendants, acting under color of state law, proximately caused the deprivation of Plaintiff's Fourteenth Amendment rights.

57. Defendants' actions were undertaken either with the intent to deprive Plaintiff of his rights, or with reckless and callous disregard for, and deliberate indifference to, Plaintiff's constitutional rights.

58. Defendant City of Naperville acted pursuant to an official policy, custom, or decision of an individual with final policy-making authority, when it proximately caused the deprivation of Plaintiff's Fourteenth Amendment rights.

### Count III

### 42 U.S.C. § 1983 – U.S. Const., Amend. I Violation

59. Plaintiff, repeats, re-alleges, and incorporates by reference paragraphs 1 through 58 as if fully set forth herein.

60. Defendants Michael Hull, Detective Michael Cross, Chief David Dial, and the City of Naperville are "persons" as that term is used in 42 U.S.C. § 1983.

61. Plaintiff was arrested by Defendants without probable cause.

62. In arresting Plaintiff without probable cause, Defendants were motivated by disapproval of the Plaintiff's long established history of vocal criticism of and opposition to the Naperville Police Department's base pay rates, overtime abuses, pension manipulation, and other behavior and practices.

63. The Defendants arrest of the Plaintiff in the absence of probable cause and based upon fabricated charges was an effort to silence the Plaintiff's political viewpoints and vocal opinions.

64. The Defendants had an economic incentive to intimidate, dampen, and possibly even silence the Plaintiff's speech, because that speech posed a direct threat to their economic interests.

65. The Plaintiff's criticism of the Department and its behavior and practices is political speech, and thus is fully protected by the First Amendment. This political speech is

precisely the type of speech which must be protected in order to ensure the effective and successful functioning of government.

66. Defendants, acting under color of state law, proximately caused the deprivation of Plaintiff's First Amendment rights.

67. Defendants' actions were undertaken either with the intent to deprive Plaintiff of his rights, or with reckless and callous disregard for, and deliberate indifference to, Plaintiff's constitutional rights.

68. Defendant City of Naperville acted pursuant to an official policy, custom, or decision of an individual with final policy-making authority, when it proximately caused the deprivation of Plaintiff's First Amendment rights.

### Count IV

### Malicious Prosecution

69. Plaintiff, repeats, re-alleges, and incorporates by reference paragraphs 1 through 68 as if fully set forth herein.

70. Defendants commenced or caused the continuation of a criminal legal proceeding against Plaintiff.

71. Defendants, through their charges and arrest of Plaintiff, were the active instigation of the criminal proceeding against Plaintiff.

72. The criminal proceedings Defendants instigated were resolved in Plaintiff's favor, on or about May 21, 2007, when he was found "not guilty," nearly two years after Furstenau announced he would be running for State Senator.

73. Defendants lacked probable cause for the instigation of the criminal proceedings against Plaintiff.

74. Defendants acted with malice in instigating, commencing, and continuing the legal proceedings against Plaintiff.

75. Plaintiff suffered damages as a result of the criminal proceeding commenced by Defendants. Plaintiff's damages included, *inter alia*, criminal attorney's fees, humiliation, financial loss, and damage his personal to reputation and that of his family.

WHEREFORE, Plaintiff, Richard Furstenau, respectfully requests that this Court:

(a) Enter an order in Plaintiff's favor;

(b) Award Plaintiff compensatory damages in an amount to be determined by the trier of fact;

(c) Award Plaintiff punitive damages, as allowed by law, and in an amount to be determined by the trier of fact; and

(d) Award Plaintiff his reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1985; and grant Plaintiff such other and further relief as the Court deems appropriate.

Dated: October 31, 2007

Respectfully submitted,

By: *John A. Sopuch III*
One of the Plaintiff's Attorneys

Shawn M. Collins
John A. Sopuch III
THE COLLINS LAW FIRM, P.C.
1770 N. Park Street, Suite 200
Naperville, Illinois 60563
(630) 527-1595
(630) 527-1193 - Fax