UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD R. FURSTENAU, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 07-CV-6143 |
| | ) | |
| v. | ) | Judge Norgle |
| | ) | Magistrate Judge Brown |
| CITY OF NAPERVILLE, a municipal | ) | |
| Corporation; MICHAEL HULL, in his | ) | |
| individual and official capacity; DAVID | ) | JURY TRIAL DEMANDED |
| DIAL, in his official and individual | ) | |
| capacity; and MICHAEL CROSS, in his | ) | |
| individual and official capacity. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT MICHAEL HULL'S ANSWER TO
PLAINTIFF'S AMENDED COMPLAINT**

NOW COMES Defendant, MICHAEL HULL, by and through his attorneys, JAMES G.

SOTOS and JOHN J. TIMBO of JAMES G. SOTOS & ASSOCIATES, LTD., and in answer to

Plaintiff's Amended Complaint states the following unto this Honorable Court.

**INTRODUCTION**

Plaintiff's five page introduction violates both Federal Rule of Civil Procedure 8(a)'s

requirement that a complaint shall contain a short and plain statement of the claim, and Rule

10(b)'s mandate that "[a]ll averments of a claim or defense shall be made in numbered

paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a

single set of circumstances...." Nonetheless, rather than burden the Court with a motion to strike

Plaintiff's excessive verbiage, which motions are disfavored in this circuit (*see Davis v. Ruby*

*Foods, Inc.*, 269 F.3d 818 (7th Cir. 2001)), Defendant has instead chosen not to respond to

Plaintiff's introduction and answer only Plaintiff's numbered averments.

## PARTIES

1.      Plaintiff Richard R. Furstenau ("Furstenau") is, and at all times relevant to the allegations in this Amended Complaint has been, a resident of the State of Illinois and a Naperville City councilman.

**ANSWER:**    Defendant admits the allegations contained in paragraph 1.

2.      Defendant City of Naperville is, and at all times relevant to the allegations in this Amended Complaint has been, a municipal corporation; the City of Naperville Police Department is a department within the municipal corporate structure of the City of Naperville.

**ANSWER:**    Defendant admits the allegations contained in paragraph 2.

3.      Defendant Michael Hull is, and at all times relevant to the allegations in this Amended Complaint has been, acting under color of state law as an officer for the Police Department of the City of Naperville.

**ANSWER:**    Defendant admits the allegations contained in paragraph 3.

4.      Defendant David Dial is, and at all times relevant to the allegations in this Amended Complaint has been, acting under color of state law as the Chief of Police for the City of Naperville.

**ANSWER:**    Defendant admits Defendant Dial is the Naperville police chief, but makes no response to the remaining legal conclusion contained in paragraph 4.

5.      Defendant Michael Cross is, and at all times relevant to the allegations in this Amended Complaint has been, acting under color of state law as an officer for the Police Department of the City of Naperville.

**ANSWER:**    Defendant admits Defendant Cross is a Naperville police officer, but makes no response to the remaining legal conclusion contained in paragraph 5.

2

6.    Defendant Peter Burchard is the former City Manager of the City of Naperville,

who took the actions complained of herein while he acted under the color of state law as the City

Manager of Naperville.

**ANSWER:**    Defendant admits Defendant Burchard is the former Naperville City Manager, but
makes no response to the remaining legal conclusion contained in paragraph 6.

7.    Defendant Margo Ely is counsel to the City of Naperville.  Ely took the actions

complained of herein while she acted under the color of state law as counsel to the City.

**ANSWER:**    Defendant admits Defendant Ely is the Naperville City Attorney, but makes no
response to the remaining legal conclusion contained in paragraph 7.

8.    Defendant Joe Matchett is, and at all times relevant to the allegations in this

Amended Complaint has been, acting under color of state law as an officer for the Police

Department of the City of Naperville.

**ANSWER:**    Defendant admits Defendant Matchett is a Naperville police officer, but makes no
response to the remaining legal conclusion contained in paragraph 8.

### III.

### JURISDICTION AND VENUE

9.    This Court has jurisdiction over the subject matter of this lawsuit pursuant to 28

U.S.C. § 1331 because this case arises under the laws of the United States of America, and

specifically alleges violations of the Fourth and Fourteenth Amendments to the United States

Constitution, brought pursuant to 42 U.S.C. § 1983.

**ANSWER:**    Defendant admits that jurisdiction is proper in this Court.

10.    This Court has supplemental jurisdiction over the Illinois state law claim set forth

in Count IV, pursuant to 28 U.S.C. § 1367, as that claim involves substantially overlapping

evidence and witnesses, involves the same events or connected series of events, and is otherwise

so related to the Plaintiff's federal question claims that they form part of the same case or

controversy under Article III of the United States Constitution.

**ANSWER:**    Defendant admits that supplemental jurisdiction over Plaintiff's state law claim
set forth in Count IV is proper in this Court.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because this case

arises out of actions that occurred within this Judicial District.

**ANSWER:**    Defendant admits that venue is proper in the Northern District of Illinois, Eastern
Division.

## IV.

## ALLEGATIONS OF FACT

### Furstenau Has Repeatedly Angered the Police
### Through his Consistent Criticism of Police Pay and Practices

12.    During his eight and a half year tenure as a Naperville City Councilman, and as

set forth below, Furstenau has regularly inflamed both the leadership and rank-and-file of the

City of Naperville City's Police Department, as he has repeatedly and openly accused the Police

of abusive pay (particularly overtime pay) practices; criticized "double-dipping" for retired City

police officers; disagreed with the Police over "pet" Police projects; and opposed the Police's

handling of cases of alleged Police misconduct.

**ANSWER:**    Defendant states that he lacks sufficient information to form a belief as to the truth
or falsity of the allegations contained in paragraph 12.

**Furstenau Accuses the Police of Abuse of Regular and Overtime Pay**

13.    Beginning in May 1999, when he first joined the City Council, Furstenau has

demanded to examine a listing of the City's 100 highest-paid employees. Furnished to him

annually, this list now has a City-conferred title which associates the issue exclusively with

Furstenau, *i.e.,* "Per City Councilman Furstenau's Request."

**ANSWER:**    Defendant states that he lacks sufficient information to form a belief as to the truth
or falsity of the allegations contained in paragraph 13.

14.    Nearly every year, Furstenau has noticed an increase in the number of police

officers appearing on the list, to the point where, in 2006, almost half of the City's 100 highest-

paid employees are members of the Police Department. Each of these police officers made more

than $100,000 in 2006. Moreover, in many of these instances, the officer received overtime pay

in excess of $25,000, and frequently the overtime pay amounted to 33% or more, of the officer's

total compensation. This has led to the fact that, of total 2006 overtime pay to all City employees

of some $7 million, approximately $5 million of that was paid to its police officers. All of this

and more has prompted Furstenau to carefully examine - and sharply criticize how the City's

police are paid, and particularly to criticize Police Department practices concerning overtime

pay.

**ANSWER:**    Defendant states that he lacks sufficient information to form a belief as to the truth
or falsity of the allegations contained in paragraph 14.

15.    During this scrutiny, Furstenau has learned that the more senior officers within

the Police Department have virtually unlimited access to their choice of overtime hours, at a pay

rate of one and one-half times regular pay. Furthermore, he has learned that overtime pay is

often "retroactively" approved, *i.e.,* approved only after it has been worked by the (typically more

5

senior) officers, without examination in advance as to whether the overtime is reasonably

required.

**ANSWER:**    Defendant admits that the Police Department works on a seniority system when
determining overtime assignments. Defendant further admits that overtime pay is
often approved after it has been worked, such as in instances where an officer
makes an arrest or is called to report to an accident with injuries near the end of
his shift. Defendant asserts that a review system is in place where supervisors
monitor such requested overtime and have the authority to deny such overtime
where it is found not to have been reasonably required.

16.    Furstenau has been critical of these Police practices because they are expensive

not only in the fiscal year in which the police overtime is paid, but also because they continue to

cost the city for many years in the future. Overtime paid this year, for example, is figured into

the police officer's base pay for purposes of determining his/her pension which will be paid upon

the officer's eventual retirement. This has the obvious result of driving up for years into the

future pension costs to the City and the taxpayers.

**ANSWER:**    Defendant states that he lacks sufficient information to form a belief as to the truth
or falsity of the allegations contained in the first sentence. Defendant denies the
allegations contained in the second and third sentences.

### Furstenau Criticizes "Double-dipping" by Retired City Police Officers

17.    Another of Furstenau's vocal and repeated criticisms of practices within the City

and Police Department is that there is no prohibition against "double-dipping" by a retired City

police officer. In other words, a City police officer may retire from service to the Police

Department and collect a pension for past service, and at the same time re-enter the work force

on a full-time basis for the City or some other municipal employer. If the retired officer does so,

then he or she is permitted to receive two checks from the City, *i.e.,* one for the pension, and the

6

other for the subsequent job. On numerous occasions, Furstenau has objected to this practice by
the City Police.

**ANSWER:**     Defendant states that he lacks sufficient information to form a belief as to the truth
or falsity of the allegations in the first and fourth sentences of paragraph 17.
Defendant admits the allegations in the second and third sentences of paragraph
17.

### Furstenau Disagrees with the Police over "Pet" Police Projects

*Taser "Stun" Guns*

18.    About four years ago, Furstenau began strongly objecting to the Police

Department's desire to equip all of its officers with taser "stun" guns. Having seen reports from

around the country regarding citizens who had been killed or severely injured as a result of being

shot with police taser guns, and concerned about the possibility of taser gun misuse by the

Naperville Police, Furstenau did not want City police to have such guns, and said so repeatedly

and vocally at, among other forums, City council meetings. His strongest concern centers on

individuals who are shot multiple times by a taser gun - because that is where the highest

incidence of fatalities occurs.

**ANSWER:**     Defendant states that he lacks sufficient information to form a belief as to the truth
or falsity of the allegations contained in paragraph 18.

19.    Furstenau lost this dispute with the Police, and, as a result, many, if not all, of the

City's police officers now have taser guns.

**ANSWER:**     Defendant admits that the Naperville City Council voted to equip its officers who
have been properly trained with taser guns, and but states that he lacks sufficient
information to form a belief as to the truth or falsity of the allegation that Plaintiff
voted in opposition to this issue.

7

20.    Nevertheless, Furstenau continues to closely monitor for possible taser gun abuse by City police, and continues to object to the police having them. His monitoring includes his requesting, and reviewing, data on the Police Department's use of tasers. In this work, Furstenau has uncovered - and voiced concern over - what he considers to be a disturbing increase in the number of times that City police officers have shot citizens with taser guns multiple times.

**ANSWER:**    Defendant states that he lacks sufficient information to form a belief as to the truth or falsity of the allegations contained in paragraph 20.

*Police-directed Towing*

21.    Last year, before the City entered into a new towing contract, the Police Department presented the City Council with its desired version of the new contract. Furstenau was not in favor of the Police-drafted version of the contract and publicly said so. Furstenau felt the contract that the Police had drafted gave the Police far too much discretion as to which cars could be towed, who would tow these cars, and to which destination these cars would be towed.

**ANSWER:**    Defendant states that he lacks sufficient information to form a belief as to the truth or falsity of the allegations contained in paragraph 21.

22.    So, in an effort to reign in what he perceived as unfettered police discretion in the towing of cars, Furstenau and other City Council members revised the draft towing contract that the Police had presented to the City Council. This revised towing contract diminished Police discretion, while strengthening the accountability to the City of towing companies. The revised version of the contract eventually prevailed.

**ANSWER:**    Defendant states that he lacks sufficient information to form a belief as to the truth or falsity of the allegations contained in paragraph 22.

8

*Seat-belt law*

23.    Several years ago, the Naperville Police Department came to the City Council and

strongly urged the passage of a City ordinance which would make it illegal to drive in or through

the City unless every occupant in a vehicle was wearing a seat-belt.  Furstenau and other City

Council members effectively prevented the Department from obtaining their desired seat-belt

ordinance.

**ANSWER:**    Defendant states that he lacks sufficient information to form a belief as to the truth
or falsity of the allegations contained in paragraph 23.

24.    Although Furstenau strongly supported the safety concerns associated with such

an ordinance, he felt that the only responsible way to address the problem was through a

comprehensive, state-wide law requiring motorists to wear seat-belts, and not through piecemeal,

city-by-city legislation.  Furstenau and other City Council members played an important role in

the state legislature's decision to pass a state-wide seat-belt law.

**ANSWER:**    Defendant states that he lacks sufficient information to form a belief as to the truth
or falsity of the allegations contained in paragraph 24.

25.    However, prior to the passing of a state-wide law, Furstenau wrangled for years

with the Police during City Council meetings by openly questioning the veracity of the Police

Department's concern for the safety of motorists.  Furstenau suspected, and vocalized his

concern, that the true motivation behind the Police's ardent support of the seat-belt law was a

desire to increase police officers' ability to randomly pull over otherwise law bidding citizens.

As he publicly stated, Furstenau did not want to pass an ordinance which gave the Police a blank

check to sit at the border between, for example, Aurora and Naperville, selectively pulling over

certain individuals under the guise of motor safety.

**ANSWER:**    Defendant states that he lacks sufficient information to form a belief as to the truth
or falsity of the allegations contained in paragraph 25.

### Furstenau Disagrees with Police over the Department's
### Handling of Internal and External Allegations of Misconduct

26.    The City Council typically addresses both internal and external claims of police

misconduct in closed council sessions, known as "executive sessions" - the contents of which are

insulated from the press and Naperville's citizens.

**ANSWER:**    Defendant states that he lacks sufficient information to form a belief as to the truth
or falsity of the allegations contained in paragraph 26.

27.    These "executive sessions" include the City Council's deliberation on settling

claims of police misconduct leveled against the City.  During these deliberations (of which the

Police Department are fully aware) on external, as well as internal, allegations of police

misconduct, Furstenau has been a vocal and outspoken critic of the Department's leadership and

supervision of its officers.  At times, Furstenau has demanded that the Department settle claims

of misconduct asserted against officers and the City that the Police strongly desired to fight in

court.  On several of these occasions, Furstenau has been the only member of the City Council to

voice any objection at all.

**ANSWER:**    Defendant states that he lacks sufficient information to form a belief as to the truth
or falsity of the allegations contained in paragraph 27.

### The Naperville Police Bring False Charges Against Furstenau,
### in Retaliation for His Past Disputes with the Police,
### and to Derail Furstenau's State Senate Campaign

28.    In late 2005, Furstenau became an even bigger threat to the Police when he

decided to run for State Senator.  To be sure, one of the platforms of Furstenau's Senate

campaign was "police pension reform."  He had been elected to the State Senate, Furstenau

10

publicly stated that he fully intended to pursue legislation which would prevent the previously-discussed "double dipping" that is such a lucrative practice for police officers, yet a serious drain on municipal budgets.

**ANSWER:**    Defendant admits that he was aware that Plaintiff was running for State Senate beginning in late 2005, but asserts that he had no knowledge whether one of Plaintiff's campaign platforms was "police pension reform" or preventing "double dipping". Defendant further denies that he ever considered Plaintiff to be a threat to himself or to police in general had Plaintiff been elected to the State Senate.

29.    To combat this threat posed by Furstenau's run for State Senate, and to retaliate against Furstenau for his longstanding and relentless criticism of the Police, on January 18, 2006, the Police arrested Furstenau, in the absence of probable cause, and based upon fabricated charges. The arrest was based upon the false accusation that, in broad daylight on January 1, 2006, with Naperville's New Year's Day parade about to start and, thus, with hundreds of people milling around, Furstenau punched a uniformed City police officer, Defendant Michael Hull, on New Year's Day on a public street in Downtown Naperville. Furstenau did no such thing.

**ANSWER:**    Defendant denies the allegations contained in paragraph 29.

30.    On January 1, 2006, Furstenau was in the downtown area of Naperville, Illinois, waiting to march in Naperville's New Year's Day parade as a City Councilman. Prior to the parade, at about 4:15 to 4:30 p.m., Furstenau was walking towards the starting point of the parade, when he observed a nearby commotion. What Furstenau observed was several individuals yelling at Officer Hull, as Hull was ordering the towing of multiple vehicles located on Chicago Ave.

**ANSWER:**    Defendant admits that Plaintiff was in downtown Naperville on January 1, 2006, but states that he lacks sufficient information to form a belief as to the truth or falsity of the remaining allegation contained in the first sentence. Defendant

11

denies that Plaintiff observed a nearby commotion while walking towards the starting point of the parade which involved Defendant being yelled at by several individuals. Defendant admits he was in the process of towing vehicles illegally parked on Chicago Ave. in Naperville, but asserts that Plaintiff was the individual who yelled at him.

31.     Furstenau approached Officer Hull to inquire into why the cars were being towed

away. Hull responded that the cars were in a designated tow zone which, although it may have

been, had not been timely identified as such. Furstenau was unsatisfied and baffled by Hull's

response, and he left the scene continuing to walk towards the start of the parade.

**ANSWER:**     Defendant denies that Plaintiff approached him to inquire into why cars were being towed away, unless by the term "inquire" Plaintiff intended to include his actual behavior of hitting Defendant in the chest and yelling demands at Defendant as to why he was towing vehicles. Defendant admits that he informed Plaintiff that the cars being towed were parked in a designated tow zone. Defendant denies that the tow zone was not timely identified as such. Defendant admits that Plaintiff eventually left the incident scene and walked toward the direction of the parade, but asserts that he lacks sufficient information to form a belief as to the truth or falsity of the allegation that Plaintiff was unsatisfied and baffled by Defendant's response to him.

32.     Approximately twenty to thirty minutes after his brief conversation with Hull,

Furstenau had a second conversation, this time with Hull and Hull's supervisor, Sergeant Steven

J. Schindlbeck. Again, Furstenau asked both officers why cars on Chicago Avenue had been,

and were being towed, and when the "Do Not Park" signs had been put up. Neither Hull nor

Schindlbeck could provide a satisfactory answer to either question. On neither the first nor this

second occasion, did Furstenau punch Hull; nor did he touch Hull. Further, while Furstenau was

standing right in front of him, at no time did Hull inform his supervisor Schindlbeck that

Furstenau had, just minutes before, punched him in the middle of the chest so hard that it had

"shocked" Hull. Indeed, when Schindlbeck was "interviewed" as part of the Police Department's

12

"investigation," Schindlbeck said nothing (not a single word) about Furstenau punching, hitting

or touching Hull.

**ANSWER:** Defendant admits that at some time after the first incident on January 1, 2006, Plaintiff approached Defendant and Sergeant Steven Schindlbeck. Defendant admits that Plaintiff initiated a "conversation" by yelling at Defendant as to why he towed vehicles on Chicago Ave.. Defendant further denies that neither he nor Sgt. Schindlbeck could provide satisfactory answers to Plaintiff's questions, and asserts that due to Plaintiff's behavior, Sgt. Schindlbeck informed Plaintiff that he should take his complaint to a higher supervisor in the City. Defendant further denies that he ever alleged that Plaintiff "punched" him on either the first or second occasion, but asserts that Plaintiff backhanded him in the chest during the first occasion. Defendant further asserts that Sgt. Schindlbeck was not an eyewitness to the first incident during which Plaintiff struck Defendant, and admits that the memorandum Sgt. Schindlbeck filed on January 3, 2006 regarding his only interaction with Plaintiff correctly did not include any mention of Plaintiff having struck Defendant.

33. After getting no answers to his questions from Hull and Schindlbeck, Furstenau

left the area.

**ANSWER:** Defendant denies the allegation contained in paragraph 33 that he and Sgt. Schindlbeck did not respond to Plaintiff's questioning. Defendant asserts that due to Plaintiff's behavior, Sgt. Schindlbeck informed Plaintiff that he should take his complaint to a higher supervisor within the City. Defendant admits that Plaintiff then left the area.

34. At no time on that day did Officer Hull or Sergeant Schindlbeck complain to

Furstenau about Furstenau's behavior, let alone warn state or even suggest to Furstenau that he

had done anything that might subject him to arrest. Indeed, Officer Hull did not arrest Furstenau

that day, and did not even hint that he might.

**ANSWER:** Defendant admits that neither he nor Sgt. Schindlbeck complained to Plaintiff about Plaintiff's earlier behavior or warn him that his earlier actions might subject him to arrest. Defendant further admits that he did not place Plaintiff under arrest on January 1, 2006, but instead immediately informed his supervisor Sgt. Ray Adkins about the battery Plaintiff committed.

13

35.    Neither did Officer Hull prepare on that day any of the documentation required of a City police officer when that officer has concluded that criminal - or even unusual - activity may have occurred.  Officer Hull on that day filed no complaint, and prepared no "Incident Report" or memorandum of any kind.

**ANSWER:**    Defendant admits that he did not prepare a memorandum of the incident until January 3, 2006.  Defendant denies that any other document was required to be filed prior to the memorandum of January 3, 2006.

36.    Approximately four (4) or five (5) days after his interaction with Officer Hull, Furstenau learned from a fellow City Councilman that the Police were investigating him for allegedly battering Hull.  This stunned Furstenau, as he knew he had done nothing of the kind, and indeed had heard no complaint from Officer Hull, any other officer or anyone concerning his behavior.

**ANSWER:**    Defendant states that he lacks sufficient information to form a belief as to the truth or falsity of the allegations pertaining to Plaintiff's notification of the investigation or Plaintiff's reaction thereto.

### The "Investigation" into Furstenau's Encounter with Hull
### was Pre-Determined to Bring Charges Against Furstenau from the Outset

37.    Obviously believing that Furstenau had committed no crime during their encounter on January 1, Officer Hull completed his shift that day, and returned home.  He did not seek medical attention for any alleged physical altercation he had experienced.  He did not go to Police headquarters to prepare any complaint or report as to anything unusual that may have happened that day.

**ANSWER:**    Defendant denies the allegation that he did not believe that Plaintiff committed a crime during their encounter on January 1st.  Defendant admits that he did complete his shift that day and returned home without seeking medical attention,

as none was required. Defendant further admits that he did not prepare a report before returning home.

38. Nevertheless, on or about January 3, Naperville Police Chief Dial - with whom Furstenau had often had disagreements about Police matters (such as those described above) - determined that an "investigation" of Furstenau's conduct should be undertaken.

**ANSWER:**     Defendant admits that an investigation into the battery began on January 3, 2006, with Defendant being asked to submit a memorandum to Sgt. Ray Adkins regarding the January 1, 2006 incident with Plaintiff. Defendant states that he lacks sufficient information to form a belief as to the truth or falsity of the remaining allegation that Plaintiff often had disagreements with Chief Dial over police matters.

39. Accordingly, Police Chief Dial appointed Naperville Police Detective Michael Cross (whom, ironically, Dial later described to Furstenau as the Police's "best man") to head the kangaroo "investigation." Chief Dial remained in charge of the "investigation" throughout; stayed in close contact with Detective Cross concerning the investigation's progress; provided Cross with "witnesses" to interview and either approved the seeking of what he knew to be unjustified criminal charges against Furstenau at the conclusion of the "investigation," or recklessly disregarded the fact that there was no lawful basis to bring such charges. Indeed, why the sitting Chief of Police was so involved in the "investigation" into Furstenau is telling.

**ANSWER:**     Defendant admits that Detective Michael Cross was assigned to investigate his allegations against Plaintiff, but denies that the ensuing investigation was a "kangaroo investigation". Defendant lacks sufficient information to form a belief as to the truth or falsity of the allegation that Chief Dial informed Plaintiff at a later date that Detective Cross was the Department's "best man". Defendant states that he lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations in paragraph 39 as they pertain to Chief Dial, but deny that the allegations against Plaintiff were false.

15

40.     The "investigation" was a sham, calculated to bring unwarranted charges against

Furstenau. This is demonstrated *inter alia,* by the following:

(a)     Even before the "investigation" began, Detective Cross and the Naperville Police
Department had concluded that they would seek felony charges for "Aggravated Battery" against
Furstenau. (The DuPage County States Attorney refused to bring "Aggravated Battery" charges
and so, more than two weeks after the alleged battery took place, Cross and Hull personally
secured from a DuPage County Judge an arrest warrant for misdemeanor charges based on a false
statement which Hull signed "on oath" and which contained materially different information than
what Hull had told Cross when Cross first "interviewed" Hull.)

**ANSWER:**     Defendant denies the investigation was a "sham", and further denies that
                Detective Cross and the Naperville Police Department concluded before the
                investigation began that they would seek felony charges for aggravated battery
                against Plaintiff. Defendant admits that the DuPage County State's Attorney
                declined an aggravated battery charge, and admits that he swore out a
                misdemeanor complaint against Plaintiff, but denies that Plaintiff's arrest warrant
                was based on a false statement.

(b)     Despite the fact that Officer Hull on January 1 had plainly concluded that
Furstenau had committed no crime-as he had made no arrest, filed no complaint, and prepared no
"Incident Report" - on January 3, Chief Dial instructed Officer Hull and others to prepare internal
memoranda on the January 1 "events." No other police officer that Dial asked to prepare an
"Incident Report" saw Hull get punched, hit, or touched by Furstenau. Moreover, the senior
officer to whom Hull claimed to have reported Furstenau's forceful battery did not even bother to
submit an Incident Report or prepare any statement whatsoever. As of today, there is no
evidence that that officer was ever even interviewed.

**ANSWER:**     Defendant denies that he concluded that Plaintiff had committed no crime on
                January 1, 2006. Defendant admits that he and other officers were directed to file
                internal memoranda regarding the January 1, 2006 events, and further admits that
                no other officer was an eyewitness to Plaintiff's backhand to Defendant's chest.
                Defendant asserts, however, that Community Service Officer Wayne Gunther was
                present during the incident and informed Defendant immediately after Plaintiff
                walked away that he had heard the slapping sound made by Plaintiff having struck
                Defendant in the chest. CSO Gunther also wrote in his January 3, 2006
                memorandum that he heard the sound made by Plaintiff striking Defendant.
                Defendant further admits that Sgt. Ray Adkins, to whom he first reported
                Plaintiff's battery, did not file a separate incident report, but states that he lacks
                sufficient information to admit or deny whether Sgt. Adkins was interviewed.

16

(c)    On January 3, 5 and 6, Officer Hull wrote and told his version of the "events" of January 1. While these re-tellings by Hull were **less than one week after** the supposed battery by Furstenau - and thus, one would think that a trained professional like Officer Hull should have had his clearest memory - Officer Hull's thrice-told version described things that did not happen, and could not have happened. For example, Hull was in error by almost two hours as to the time of the alleged crime. Officer Hull three times reported that his exchange with Furstenau occurred at 2:50, when Furstenau was nowhere near Officer Hull or even in the area where he claimed that Furstenau had punched him. Officer Hull was also in error about the downtown Naperville building from where Furstenau emerged just before the alleged "crime."

**ANSWER:**    Defendant admits that he first wrote a memorandum to Sgt. Adkins on January 3, 2006 regarding the subject incident, and then created an incident report on January 5, 2006 before being formally interviewed on January 6, 2006 by Detective Cross and then Sgt. Robert Guerrieri. Defendant further admits that his initial estimation regarding the time of the incident with Plaintiff was incorrect, but denies that his incorrect estimation was off by almost two hours. Defendant further asserts that he corrected the approximate time of the incident by reviewing his tow report for a VW Jetta he had towed from Chicago Ave. minutes before Plaintiff battered him. Defendant lacks sufficient knowledge to either admit or deny the allegation that he was in error as to the downtown Naperville building from where Furstenau emerged just before the alleged "crime, but asserts that he believed that Plaintiff had emerged from Features Bar and Restaurant, as he first observed Plaintiff standing on the steps of said establishment.

(d)    These material errors should have halted any investigation, and certainly any thought of pressing felony charges. They did not. Instead, Detective Cross re-interviewed Officer Hull, and told him what other witnesses had said about the time when Furstenau and Officer Hull had briefly been together on January 1. As a result of this re-interview, Officer Hull "corrected" his version of events, and agreed to a timeline which Detective Cross had suggested to him, and described as "more consistent" with that offered by other witnesses.

**ANSWER:**    Defendant denies that these perceived errors should have served as the basis for discontinuing the investigation or refraining from pursuing felony charges. Defendant admits that he was re-interviewed by Detective Cross, but denies that Detective Cross "suggested" a timeline to him during the second interview. Defendant admits that he corrected his error regarding the time the incident occurred as a result of the second interview.

(e)    Of the approximately 10 witnesses interviewed in connection with the "investigation," only one-Officer Hull-stated that Furstenau had hit him. All others either denied that Furstenau had done any such thing, stated that they saw no such contact, or were otherwise unable to support the pre-determined "Aggravated Battery" charge that the police had come up with. Accordingly, the only witness alleging Furstenau had hit Officer Hull was Hull himself-

who had failed to make any arrest, voice any complaint, or prepare any report of physical contact allegedly so serious and forceful that it had "shocked" Hull and constituted felony "Aggravated Battery," and who, in the three reports he subsequently offered at the behest of Chief Dial, could not even get the time right, and thus had to be told to change his story.

**ANSWER:**     Defendant admits that he was the only person who reported that he saw Plaintiff hit him. Defendant denies the remaining allegations of subparagraph (e). Defendant asserts upon information and belief that CSO Wayne Gunther stated in his report and interview that he heard a loud slapping sound immediately before turning his head and witnessing Plaintiff yell at Defendant to his face. Defendant further asserts that no other witness denied that Plaintiff had touched him, but instead stated either that they arrived only after Plaintiff began yelling at him, which was after Plaintiff slapped him, or that they did not focus on Plaintiff and Defendant until after the slap would have occurred. Defendant further asserts that he did immediately voice his complaint to CSO Gunther at the scene upon Plaintiff having walked away, and then to Sgt. Ray Adkins, and began describing the incident to Sgt. Schindlbeck when Plaintiff again approached him. Defendant thereafter spoke with Chief Dial later in the evening on January 1, 2006 before ending his shift, filed his initial memorandum on January 3, 2006, and incident report on January 5, 2006. Defendant further denies that he changed his story, but asserts that he mistakenly estimated the time of the incident, and later corrected the mistake.

(f)     Police Chief Dial personally invited Furstenau to be interviewed by Detective Cross in connection with the "investigation." Furstenau consented to be interviewed by Cross, and did not even bring a lawyer with him. Furstenau answered all of the Police's (and Detective Cross's) questions, including making a vigorous denial of any allegation that he had ever hit Officer Hull. However, Chief Dial did not inform Furstenau that, well before the interview, his Police Department had already decided to charge Furstenau with felony "Aggravated Battery."

**ANSWER:**     Upon information and belief, Defendant admits that Chief Dial informed Plaintiff that Detective Cross wanted to interview him regarding Defendant's allegation. Defendant admits that Plaintiff was interviewed by Detective Cross and Sgt. Guerrieri on January 6, 2006, and did not have an attorney present during questioning. Defendant further admits that Plaintiff answered all questions posed to him, and denied hitting Defendant. Defendant denies that the Police Department had already decided to charge Plaintiff with felony aggravated battery before the Plaintiff appeared for his interview.

(g)     When asked by Detective Cross if he could provide any witness who saw what happened between Furstenau and Hull, Furstenau gave Detective Cross two names. Cross interviewed both witnesses and both (who were just a few feet from Furstenau and Hull when Furstenau allegedly punched Hull) refuted Hull's ridiculous version of events. Unbelievably,

Cross, the Department's "best man" did not ask either of the witnesses whether they had seen Furstenau punch, hit or touch Hull.

**ANSWER:**    Upon information and belief, Defendant admits Plaintiff gave Detective Cross the names of two witnesses whom Detective Cross and his partner interviewed. Defendant denies the remaining allegations in paragraph 40.

41.    Despite glaring holes in Officer Hull's account of the incident, despite the lack of any witness who could corroborate the alleged battery, despite the fact that Hull's account had been refuted and despite the failure to properly interview all individuals who witnessed the "incident," on January 17, 2006 Detective Cross spoke with Assistant State's Attorney Jennifer Piccione and demanded that felony charges be brought against Furstenau. This request was denied. Undeterred, on that same day (just hours after the denial by Prosecutor Piccione), Officer Hull and Detective Cross went to Dupage County Courthouse and obtained an arrest warrant for Furstenau.

**ANSWER:**    Defendant admits that Detective Cross spoke with Assistant State's Attorney Jennifer Piccione, that felony charges were not approved, and that he and Detective Cross obtained an arrest warrant at the DuPage County Courthouse later that day. Defendant denies the remaining allegations of paragraph 41.

### Furstenau's Arrest Destroys His State Senate Campaign, and Badly Damages his Reputation

42.    Furstenau's arrest was the death knell for his chance to win the State Senate seat. Newspaper headlines which began on January 8, 2007 (sic) with a leak from Police gave the arrest a prominence that made it impossible for Furstenau's campaign to succeed. Indeed, the first wave of articles came out before Furstenau had been charged with anything and while the "investigation" by Cross was still ongoing. The story had clearly been leaked to the press by the Police Department.

**ANSWER:** Defendant denies the allegation contained in the first sentence. Defendant admits that the first newspaper article of the incident came out on or about January 8, 2006, but denies, upon information and belief, that the Police Department "leaked" the story, and denies that such articles caused Plaintiff's campaign for state senate to fail.

43. Furstenau's opponent made the most of the headlines. The opponent's campaign literature reproduced stories of the news of Furstenau's arrest, and was circulated throughout the Senate district. The arrest was spotlighted as the reason to vote against Furstenau. To be sure, the stories about the "investigation" of Furstenau and his subsequent arrest were huge. Indeed, in its end-of-the-year edition for 2006, the Naperville Sun reported that its readers had voted the story on Furstenau's arrest as the "top story of 2006."

**ANSWER:** Defendant states that he lacks sufficient information to form a belief as to the truth or falsity of the allegations contained in the first, second, third and fourth sentences. Defendant admits that the Naperville Sun reported that its readers had voted the story of Plaintiff's arrest the "top story of 2006" in its end of the year edition.

44. As a result, in a race where originally Furstenau had been given an excellent chance to win, he was ultimately defeated by a 60-40% margin.

**ANSWER:** Defendant states that he lacks sufficient information to form a belief as to the truth or falsity of the allegations contained in paragraph 44.

45. Unfortunately the damage did not stop with the election loss. Furstenau's reputation within the Naperville community has been irreparably harmed, even despite his ultimate acquittal.

**ANSWER:** Defendant admits that Plaintiff was acquitted, but lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations in paragraph 45.

**Officer Hull Does Not Appear at Furstenau's
Criminal Trial; Furstenau is Acquitted**

46.    As the final proof that the charges against Furstenau were false, the only witness

claiming Furstenau had hit Officer Hull-Hull himself-failed to appear in person at Furstenau's

criminal trial.

**ANSWER:**    Defendant denies the allegations contained in paragraph 46.

47.    The DuPage County Judge presiding over the criminal case found Furstenau not

guilty of the battery that Hull had fabricated.

**ANSWER:**    Defendant admits that the trial judge found Plaintiff not guilty of battery, but
denies that he fabricated the allegations against Plaintiff.  Defendant asserts that
the trial judge stated in his ruling "[T]here's no wrong or inappropriate behavior
shown by Officer Hull. In fact, he probably demonstrated restraint", and "I think
what occurred was embarrassing, inappropriate."

**Furstenau Seeks Redress for his False Arrest and
Defendants Retaliate By Subjecting Him to
Further Unconstitutional Actions**

48.    After he was acquitted of the criminal charges that had been brought against him,

Furstenau wrote a letter to his fellow Naperville City Counsel members and other city officials

which requested that the City apologize to him for what the City and its police department had

put him through.  In addition, Furstenau requested reimbursement for the legal fees that he had

paid to his defense counsel as well as additional monies that he could use to repay the people

who had contributed to his Senate campaign - a campaign which, following his arrest, had no

chance of success.

**ANSWER:**    Defendant admits that after Plaintiff was acquitted of the criminal charge brought
against him, he sent a letter to the City Council on August 24, 2007 requesting an
apology and $130,000.00.  Defendant denies any allegation that such charge was
false or that such charge was a cause of Plaintiff's failed State Senate campaign.

21

49.    Furstenau's request for an apology and reimbursement monies was rejected by the City of Naperville. Indeed, in a letter to Furstenau, Ely told him in no uncertain terms that his request for an apology, reimbursement of his legal fees and other compensation was groundless. Instead of apologizing to Furstenau and reimbursing him, and in retaliation for his request for apology and reimbursement, the City and a majority of the Naperville City Council voted to implement - for the first time in its history - a censure mechanism which gives the City Council the right to publicly reprimand any one of its individual members.

**ANSWER:**    Upon information and belief, Defendant admits that Peter Burchard, the former City Manager for the City of Naperville, sent a letter to Plaintiff on September 7, 2007 rejecting Plaintiff's demand letter of August 24, 2007. Defendant lacks sufficient information to form a belief as to the truth or falsity of the allegation that Margo Ely sent a letter to Plaintiff stating that Plaintiff's request for an apology, reimbursement of his legal fees and other compensation was groundless. Defendant denies that he was involved in the implementation of or vote concerning a censure mechanism inside the City Council.

50.    Following the rejection of Furstenau's request for an apology and reimbursement, Furstenau filed this lawsuit on October 31, 2007, seeking redress for the serious violations of his constitutional rights at the hands of the city and its police.

**ANSWER:**    Defendant admits that Plaintiff filed his original lawsuit on October 31, 2007, but denies any allegation of having violated Plaintiff's constitutional rights.

51.    Defendants have responded to the filing of Furstenau's lawsuit, in an orchestrated manner, by taking further illegal and unconstitutional actions against Furstenau. Specifically, on or about November 30, 2007, Burchard authored a screed against Furstenau on City of Naperville letterhead - which was dubbed an "open letter" and circulated to the press and public - and which repeatedly blasted Furstenau for events as old as 2003. As it respected Furstenau's allegations against the Naperville Police on New Year's Day 2006, Burchard's "open letter" contained a

22

false and defamatory story concocted by Burchard that Furstenau had admitted to Burchard that

he (Furstenau) "may have tapped Officer Hull."

**ANSWER:** Defendant denies that he has taken any illegal or unconstitutional action against Plaintiff either on his own or in an orchestrated manner with others as a response to the Plaintiff having filed his lawsuit on October 31, 2007. As the remaining allegations contained in paragraph 51 are not directed at this Defendant, Defendant makes no further response to said allegations as said allegations are directed towards a different Defendant.

52.    Burchard's "open letter" went on to level further false, defamatory and

exaggerated charges against Furstenau. The fact of the matter is that Burchard, in concert with

others, used the "open letter" to smear and punish Furstenau for the filing of this lawsuit.

**ANSWER:** Defendant denies that he has taken any illegal or unconstitutional action against Plaintiff either on his own or in an orchestrated manner with others to smear or punish the Plaintiff for the filing of his lawsuit on October 31, 2007.

53.    After Furstenau filed this lawsuit, the City hired lawyers for itself and for the

police officers. Because Furstenau is the plaintiff in this lawsuit, the City Council holds

meetings in executive session (without Furstenau's participation) to discuss with counsel the

strategy for defending this case. Those executive sessions, however, are to be limited to

discussing the defense strategy of this case. Any other executive sessions covering any other

topic must, by law, include Furstenau.

**ANSWER:** Defendant admits that the City of Naperville retained counsel for himself, Chief David Dial and Detective Michael Cross to defend against Plaintiff's lawsuit. Defendant lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations contained in paragraph 53.

54.    On Tuesday, December 4, 2007, the Naperville City Council (with the exception

of Furstenau) held such an executive session with counsel purportedly for the exclusive purpose

of discussing this lawsuit. However, in addition to presumably discussing defense strategy, the

23

City Council - without affording Furstenau the right to participate - appears to have discussed and crafted a censure resolution against Furstenau which the Mayor of Naperville then attempted to unveil in the public portion of the Council meeting. This censure effort was said to be aimed at "reprimanding" Furstenau because of the allegations in Burchard's "open letter," despite: the falsity of those allegations; the fact that no opportunity was afforded Furstenau to confront the allegations; that the Council had undertaken no fact finding and despite the fact that the (false) allegations of Burchard's "open letter" concern alleged behavior that occurred almost entirely prior to the passage of the censure mechanism.

**ANSWER:**    Defendant lacks sufficient information to form a belief as to the truth or falsity of the allegations contained in paragraph 54.

55.    At that same City Council meeting, and again later that same week, defendant Ely approached individuals whom she perceived as sympathetic to Furstenau and who have projects which require Council approval. Ely told these businesspeople that if they continued to support Furstenau, they would not get Council approval for their projects.

**ANSWER:**    Defendant lacks sufficient information to form a belief as to the truth or falsity of the allegations contained in paragraph 55.

56.    In addition to her threats, defendant Ely also penned her own open letter to the press and public where she falsely stated that the allegations against Furstenau in Burchard's "open letter" - which included allegations concerning Furstenau's alleged battery of Officer Hull - were "undisputed."

**ANSWER:**    Defendant lacks sufficient information to form a belief as to the truth or falsity of the allegations contained in paragraph 56.

24

57.     Finally, and, most recently, defendant Matchett wrote yet another "open letter" to

the press, public and others which, on behalf of the Naperville Police, further defamed Furstenau

by, *inter alia*, falsely claiming that Furstenau battered Officer Hull.

**ANSWER:**     Defendant admits that Officer Joe Matchett wrote an "open letter" to the press and
others which in part described the January 1, 2006 incident between Defendant
and Plaintiff, but denies that said letter defamed Plaintiff by falsely claiming that
Furstenau battered Officer Hull.

58.     All of the actions set forth herein are part of Defendants' orchestrated campaign to

silence and discredit Furstenau, and to retaliate against him for exercising his constitutional right

to speak out and his right to seek redress for the abuse he has suffered and continues to suffer.

**ANSWER:**     Defendant denies the allegations contained in paragraph 58.

## Count I

### 42 U.S.C. § 1983 - U.S. Const., Amend. IV Violation

59.     Plaintiff, repeats, re-alleges, and incorporates by reference paragraphs 1 through

58 as if fully set forth herein.

**ANSWER:**     Defendant repeats, re-affirms, and incorporates by reference his answers to
paragraphs 1 through 58 as if fully set forth herein.

60.     Defendants Michael Hull, Detective Michael Cross, Chief David Dial, and the

City of Naperville are "persons" as that term is used in 42 U.S.C. § 1983.

**ANSWER:**     Defendant admits the allegations contained in paragraph 60.

61.     Furstenau was arrested and detained by Defendants without probable cause, in

violation of his Fourth and Fourteenth Amendment rights.

**ANSWER:**     Defendant denies the allegations contained in paragraph 61.

62.    Defendants, acting under the color of state law, proximately caused the deprivation of Furstenau's Fourth Amendment rights.

**ANSWER:**    Defendant denies the allegations contained in paragraph 62.

63.    Defendants' actions were undertaken either with the intent to deprive Furstenau of his rights, or with reckless and callous disregard for, and deliberate indifference to, Furstenau's constitutional rights.

**ANSWER:**    Defendant denies the allegations contained in paragraph 63.

64.    Defendant City of Naperville acted pursuant to an official policy, custom or decision of an individual with final policy-making authority, and proximately caused the deprivation of Furstenau's Fourth Amendment rights.

**ANSWER:**    Defendant makes no response to the allegations contained in paragraph 64 as said allegations are directed toward a separate Defendant.

WHEREFORE, the Defendant denies that the Plaintiff is entitled to any judgment whatsoever against him and prays this Honorable Court will enter judgment in his favor and allow for the costs of defending this lawsuit.

### Count II

### 42 U.S.C. § 1983-U.S. Const., Amend. XIV Violation

65.    Plaintiff, repeats, re-alleges, and incorporates by reference paragraphs 1 through 58 as if fully set forth herein.

**ANSWER:**    Defendant repeats, re-affirms, and incorporates by reference his answers to paragraphs 1 through 58 as if fully set forth herein.

66.    Defendants Michael Hull, Detective Michael Cross, Chief David Dial, and the City of Naperville are "persons" as that term is used in 42 U.S.C. § 1983.

26

**ANSWER:**    Defendant admits the allegations contained in paragraph 66.

67.    Furstenau was arrested by Defendants without probable cause.

**ANSWER:**    Defendant denies the allegations contained in paragraph 67.

68.    In arresting Furstenau without probable cause, Defendants intentionally treated Furstenau differently from others similarly situated, in violation of Furstenau's Fourteenth Amendment right to equal protection under the law.

**ANSWER:**    Defendant denies the allegations contained in paragraph 68.

69.    Defendants' differential treatment of Furstenau was without rational basis, or based upon Defendants' wholly illegitimate animus toward Furstenau.

**ANSWER:**    Defendant denies the allegations contained in paragraph 69.

70.    Defendants, acting under color of state law, proximately caused the deprivation of Furstenau's Fourteenth Amendment rights.

**ANSWER:**    Defendant denies the allegations contained in paragraph 70.

71.    Defendants' actions were undertaken either with the intent to deprive Furstenau of his rights, or with reckless and callus disregard for, and deliberate indifference to, Furstenau's constitutional rights.

**ANSWER:**    Defendant denies the allegations contained in paragraph 71.

72.    Defendant City of Naperville acted pursuant to an official policy, custom or decision of an individual with final policy-making authority, when it proximately caused the deprivation of Furstenau's Fourteenth Amendment rights.

**ANSWER:**    Defendant makes no response to the allegations contained in paragraph 72 as said allegations are directed toward a separate Defendant.

27

WHEREFORE, the Defendant denies that the Plaintiff is entitled to any judgment whatsoever against him and prays this Honorable Court will enter judgment in his favor and allow for the costs of defending this lawsuit.

## Count III

### 42 U.S.C. 1983-U.S. Const., Amend. I Violation

73.    Furstenau, repeats, re-alleges, and incorporates by reference paragraphs 1 through 58 as if fully set forth herein.

**ANSWER:**    Defendant repeats, re-affirms, and incorporates by reference his answers to paragraphs 1 through 58 as if fully set forth herein.

74.    Defendants Michael Hull, Detective Michael Cross, Chief David Dial, Peter Burchard, Margo Ely, Joe Matchett and the City of Naperville are "persons" as that term is used in 42 U.S.C.§ 1983.

**ANSWER:**    Defendant admits the allegations contained in paragraph 74.

75.    Furstenau was arrested by Defendants without probable cause.

**ANSWER:**    Defendant denies the allegations contained in paragraph 75.

76.    In arresting Furstenau without probable cause, Defendants were motivated by disapproval of the Furstenau's (sic) long established history of vocal criticism of and opposition to the Naperville Police Department's base pay rates, overtime abuses, pension manipulation, and other behavior and practices.

**ANSWER:**    Defendant denies the allegations contained in paragraph 76.

28

77.     The Defendants' arrest of the Furstenau [sic] in the absence of probable cause and based upon fabricated charges was an effort to silence the Furstenau's [sic] political viewpoints and vocal opinions.

**ANSWER:**     Defendant denies the allegations contained in paragraph 77.

78.     Following the filing of the instant suit seeking Court redress for the abuse, Defendants engaged in a campaign of harassment and intimidation to retaliate against Furstenau for exercising his constitutional right, and in a further attempt to punish him for his expression of political viewpoints.

**ANSWER:**     Defendant denies the allegations contained in paragraph 78.

79.     The Defendants had an economic incentive to retaliate, intimidate, dampen, deter and even silence Furstenau's speech, because that speech posed a direct threat to their economic interests.

**ANSWER:**     Defendant denies the allegations contained in paragraph 79.

80.     Furstenau's criticism of the Police and their behavior and practices is political speech, and thus is fully protected by the First Amendment.  This political speech is precisely the type of speech which must be protected in order to ensure the effective and successful functioning of government.  The other views Furstenau has expressed as a Councilman, and for the expression of which Defendants have sought to punish him, are similarly deserving of protection.

**ANSWER:**     Defendant makes no response to Plaintiff's legal conclusion that his criticism of
                the Police Department is political speech protected by the First Amendment.

29

81.    Defendants, acting under color of state law, proximately caused the deprivation of Furstenau's First Amendment rights.

**ANSWER:**    Defendant denies the allegations contained in paragraph 81.

82.    Defendants' actions were without justification, and motivated either to punish Furstenau with the intent to deprive Plaintiff of his rights, or undertaken with reckless and callous disregard for, and deliberate indifference to, Furstenau's constitutional rights.

**ANSWER:**    Defendant denies the allegations contained in paragraph 82.

83.    Defendant City of Naperville acted pursuant to an official policy, custom, or decision of an individual with final policy-making authority, when it proximately caused the deprivation of Furstenau's First Amendment rights.

**ANSWER:**    Defendant makes no response to the allegations contained in paragraph 83 as said allegations are directed toward a separate Defendant.

WHEREFORE, the Defendant denies that the Plaintiff is entitled to any judgment whatsoever against him and prays this Honorable Court will enter judgment in his favor and allow for the costs of defending this lawsuit.

## Count IV

### Malicious Prosecution

84.    Furstenau, repeats, re-alleges, and incorporates by reference paragraphs 1 through 58 as if fully set forth herein.

**ANSWER:**    Defendant repeats, re-affirms, and incorporates by reference his answers to paragraphs 1 through 58 as if fully set forth herein.

85.    Defendants commenced or caused the continuation of a criminal legal proceeding against Furstenau.

30

**ANSWER:**    Defendant admits that he commenced and caused the continuation of the criminal legal proceeding against Plaintiff.

86.    Defendants, through their charges and arrest of Furstenau, were the active

instigation of the criminal proceeding against Furstenau.

**ANSWER:**    Defendant admits that he commenced and caused the continuation of the criminal legal proceeding against Plaintiff.

87.    The criminal proceedings Defendants instigated were resolved in Furstenau's

favor, on or about May 21, 2007, when he was found "not guilty," nearly two years after

Furstenau announced he would be running for State Senator.

**ANSWER:**    Defendant admits that Plaintiff was found not guilty of the criminal charges in May, 2007, although the trial judge specifically stated that "[T]here's no wrong or inappropriate behavior shown by Officer Hull. In fact, he probably demonstrated restraint", and "I think what occurred was embarrassing, inappropriate."

88.    Defendants lacked probable cause for the instigation of the criminal proceedings

against Furstenau.

**ANSWER:**    Defendant denies the allegations contained in paragraph 88.

89.    Defendants acted with malice in instigating, commencing, and continuing the

legal proceedings against Furstenau.

**ANSWER:**    Defendant denies the allegations contained in paragraph 89.

90.    Furstenau suffered damages as a result of the criminal proceeding commenced by

Defendants. Furstenau's damages included, *inter alia*, criminal attorney's fees, humiliation,

financial loss, and damage his personal to reputation [sic] and that of his family.

**ANSWER:**    Defendant denies the allegations contained in paragraph 90.

31

WHEREFORE, the Defendant denies that the Plaintiff is entitled to any judgment whatsoever against him and prays this Honorable Court will enter judgment in his favor and allow for the costs of defending this lawsuit.

s/John J. Timbo
John J. Timbo, Attorney No. 06238251
Attorney for Defendants
JAMES G. SOTOS & ASSOCIATES
550 East Devon, Suite 150
Itasca, Illinois 60143
(630) 735-3300
(630) 773-0980 (fax)
jtimbo@jsotoslaw.com

### FIRST AFFIRMATIVE DEFENSE

NOW COMES Defendant MICHAEL HULL, by and through his attorneys JAMES G. SOTOS and JOHN J. TIMBO of JAMES G. SOTOS & ASSOCIATES, LTD., and for his First Affirmative Defense to Plaintiff's Amended Complaint states the following:

Plaintiff cannot establish the requisite elements to establish a false arrest claim as contained in Count I, an equal protection claim as contained in Count II, a First Amendment retaliation claim as contained in Count III or a malicious prosecution claim as contained in Count IV against Defendant and thus all counts should fail as a matter of law.

### SECOND AFFIRMATIVE DEFENSE

NOW COMES Defendant MICHAEL HULL, by and through his attorneys JAMES G. SOTOS and JOHN J. TIMBO of JAMES G. SOTOS & ASSOCIATES, LTD., and for his Second Affirmative Defense to Plaintiff's Amended Complaint states the following:

Officer Michael Hull was a police officer performing discretionary functions. At all

relevant times, a reasonable police officer objectively viewing the facts and circumstances that

confronted Officer Hull would have believed his actions to be lawful in light of clearly

established law and the information Officer Hull possessed. Officer Hull is therefore entitled to

qualified immunity.

### THIRD AFFIRMATIVE DEFENSE

NOW COMES Defendant MICHAEL HULL, by and through his attorneys JAMES G.

SOTOS and JOHN J. TIMBO of JAMES G. SOTOS & ASSOCIATES, LTD., and for his Third

Affirmative Defense to Plaintiff's Amended Complaint states the following:

Probable cause existed for Plaintiff's arrest, and thus Counts I, II, III, and IV must fail as

a matter of law.

### FOURTH AFFIRMATIVE DEFENSE

NOW COMES Defendant MICHAEL HULL, by and through his attorneys JAMES G.

SOTOS and JOHN J. TIMBO of JAMES G. SOTOS & ASSOCIATES, LTD., and for his Fourth

Affirmative Defense to Plaintiff's Amended Complaint states the following:

With regard to Plaintiff's state law malicious prosecution claim contained in Count IV,

Defendant is entitled to immunity pursuant to §2-204 of the Illinois Tort Immunity Act, 745

ILCS 2-204, for liability for injury arising out of the arrest and prosecution of Plaintiff in that a

public employee acting within the scope of his or her employment cannot be liable for an injury

caused by the act or omission of another person.

## **FIFTH AFFIRMATIVE DEFENSE**

NOW COMES Defendant MICHAEL HULL, by and through his attorneys JAMES G.

SOTOS and JOHN J. TIMBO of JAMES G. SOTOS & ASSOCIATES, LTD., and for his Fifth

Affirmative Defense to Plaintiff's Amended Complaint states the following:

With regard to Plaintiff's state law malicious prosecution claim contained in Count IV,

Defendant is entitled to immunity pursuant to §2-201 of the Illinois Tort Immunity Act, 745

ILCS 2-201, in that the acts complained of against Defendant involved the determination of

policy or the exercise of discretion.

Dated: December 31, 2007        s/John J. Timbo
                      John J. Timbo, Attorney No. 06238251
                      Attorney for Defendants
                      JAMES G. SOTOS & ASSOCIATES
                      550 East Devon, Suite 150
                      Itasca, Illinois 60143
                      (630) 735-3300
                      (630) 773-0980 (fax)
                      jtimbo@jsotoslaw.com

## CERTIFICATE OF SERVICE

The undersigned having first been duly sworn under oath, states that he electronically filed a complete copy of the foregoing **Defendant Michael Hull's Answer To Plaintiff's Amended Complaint** with the Clerk of the Court on **December 31, 2007** using the CM/ECF system, which will send notification of such filing to the following counsel of record: John A. Sopuch, Shawn Michael Collins, Richard Thomas Sikes, Jr. and Terrence J. Sheahan.

s/John J. Timbo
John J. Timbo, Attorney No. 06238251
Attorney for Defendants
JAMES G. SOTOS & ASSOCIATES
550 East Devon, Suite 150
Itasca, Illinois 60143
(630) 735-3300
(630) 773-0980 (fax)
jtimbo@jsotoslaw.com

35