Furstenau v. City of Naperville, et al.
Case No.: 07-CV-6143

# GROUP EXHIBIT B

# CITY OF NAPERVILLE
# MEMORANDUM

**DATE:**      November 30, 2007

**TO:**        Mayor Pradel
             City Council
             Director Leadership Team
             Others

**FROM:**      Peter T. Burchard

**SUBJECT:**   Open Letter

---

During my entire career in local government, I have been an advocate of the Council-Manager form of government. The Council-Manager form of government was started by ordinary citizens who wanted to professionalize government services and ensure that employees are insulated from political influence in carrying out the municipal mission. Specifically, by professionalizing government services, citizens sought to remove politically based preference from the business of government in key areas such as hiring, purchasing and service levels.

As an advocate of this form of government, I have consistently praised and supported the Mayors, Village Presidents, Trustees and Councilmen I have worked for. With only the rarest of exceptions, these public servants consistently demonstrate their desire to act only in the best interest of the public and in conformance with the values of professional government. Indeed, the chief executive in a Council-Manager form of government must show respect for the role and authority of the elected officials when they act and sit as a governing body.

As a student, and occasional teacher of political science and public administration, I believe that great organizations, public or private, achieve success when the organization embraces and demonstrates strong values. These values include hard work, innovation, respect for others, honesty, integrity and dedication to serving the community. In just the last few years, across the country, we have witnessed numerous accounts of misdeeds by individuals and organizations in both the private and public sectors. Frequently, the fall of a person, organization or company is associated with a serious breach in shared values. In some cases, there is a record that demonstrates that others have attempted to address the problems and encourage an individual to stop their destructive behavior. When meaningful efforts to change behaviors inconsistent with organization values have failed, other means must be pursued, including making the public aware of the problems in the hope that organizational values will be restored and that employees can go on about the business of serving the public.

For many years, Naperville Councilman Dick Furstenau has demonstrated a pattern of verbal attacks against employees of the City of Naperville. This pattern of verbal attacks has included accusations that city employees are taking bribes, that employees intentionally subvert council direction, that our purchasing team steers contracts, and that we intentionally delay or reject civil engineering plans in order to prevent someone from developing his property. Simply stated, on

numerous occasions, when Councilman Furstenau has not gotten his way (in many instances after the City Council has decided a matter) or disagrees with a staff decision, he responds by inventing accusations of employee misconduct and threatens employees with their jobs. His unfettered mistreatment of employees is in stark contrast to our shared values. Councilman Furstenau's attacks on employees has negatively impacted employee morale, caused some employees to leave their employment with the city, caused many employees to state that he has created a hostile work environment, potentially caused some employees' careers to suffer because of false allegations, and otherwise disrupted the work environment and our productivity

For example:

1. Within the last two weeks, Councilman Furstenau stated to a prominent Naperville business person that a certain city department director "...needs to be careful or she would be the next to lose her job." The Councilman was expressing disagreement with a memo this department wrote regarding a development known as Treehouse at the Ravines. He further implied that her firing should not be a problem because "she has a husband."

   Councilman Furstenau's comments are discriminatory, derogatory, and indicate his continuing refusal to follow the personnel practices of the Council-Manager form of government.

2. On July 15, 2005, Councilman Furstenau demanded a meeting with staff to discuss a property owned by his friend Mr. Jim Hackett (off Spring Street) and the adjacent development known as Fremont Pointe. The meeting included Councilman Furstenau, Mr. Hackett and five city employees, including the city attorney and two development team leaders. Previously, Councilman Furstenau had stated to me and other city employees that he was strongly against the development known as Fremont Pointe. The City Council concurred with staff's opinion that the project could appropriately move forward. During the meeting on July 15, 2005, Councilman Furstenau, displeased with staff's professional opinions, responded by saying that city employees are "on the take with this developer." Councilman Furstenau also specifically stated that "somebody around here has got money in their account from him (the developer)." Councilman Furstenau further stated that staff is working with the developer of Fremont Pointe to make sure that the project never goes to the City Council.

   I believe Councilman Furstenau's comments stem directly from his close friendship with the late Mr. Hackett. In my opinion, Councilman Furstenau disregarded the opinions of the city attorney and planning team leader because of his close personal friendship. In an attempt to get his way, Councilman Furstenau accused employees of criminal behavior. When I confronted Councilman Furstenau and asked him if he had any evidence to support his charges, he said "no." Instead, he expected me to start an investigation to determine if he was right. I suggested to Councilman Furstenau that his baseless charges

are the equivalent of a "witch hunt" motivated by his friendship with Mr. Hackett and his desire to overturn staff's lawful and professional decisions.

3. Over the last two years or more, Councilman Furstenau has had at least 25 conversations and meetings with me and other city staff regarding the development of Naperville Crossings. Typically, the conversations focused on his support for one of the developers of this project and his adamant disagreement with city engineering staff regarding our rejection of the developer's civil engineering plans and related issues such as the infamous dirt pile. These accusations culminated in a series of events in May, 2007. In early May, Councilman Furstenau and one of the developers of the project held a series of small meetings with other councilmen to discuss Councilman Furstenau's conclusion that city staff was engaged in an intentional effort to drag their feet and not approve this developer's portion of the project. Indeed, in an email to me dated May 8, 2007, Councilman Furstenau made it clear that it was he, and not the developer who "accused the city staff of dragging their feet."

Once again, when asked by me directly if he had any proof that city staff was "dragging their feet," Councilman Furstenau said, "no" and he added that there must be a reason why staff won't approve these plans. Councilman Furstenau refused to acknowledge the professional engineering duty to approve only plans that comply with our standard development practices. In addition, according to the developer's engineer, the developer had failed to pay his engineering fees and, therefore, the developer's engineer would not update the plans or certify their accuracy. In addition, the developer was in bankruptcy and to my knowledge, had not made a single payment on his development loan with the First National Bank of Naperville. Councilman Furstenau flatly rejected this explanation and continued to explain to me that city staff was at fault and had personal reasons for not approving the developer's plans. Indeed, the developer only needed to correct his plans and approval would be automatic.

Related to the same project, Councilman Furstenau had a meeting with two city employees. One of the city employees is a front line employee. While pounding his fist on the table, Councilman Furstenau stated to this employee that he was angry and upset that city staff would not go ahead and approve this developer's engineering plans. Without providing any evidence, he accused these employees of intentionally rejecting the plans for reasons other than the city's technical requirements. As an aggressive act of intimidation, Councilman Furstenau asked the employee, "How do you like your job?" The employee and a supervisor filed a complaint that the Councilman's behavior towards them was "intimidating and constitutes harassment."

Further, in the course of these discussions, Councilman Furstenau wanted city staff to approve the developer's stormwater management plan. Councilman Furstenau insisted on the approval despite the fact that staff demonstrated that the developer's plans were still substantially deficient and did not meet the legal requirements for stormwater. Instead of encouraging the developer to comply with the legal requirements, Councilman

Furstenau continuously badgered our engineering team and suggested that we were imposing standards that were too strict on this one developer.

4. In recent months, the City Council deliberated the release of funds in a cash deposit with the city related to Naperville Crossings. A related issue involved setting aside funds from the cash deposit to re-grade an extensive dirt pile. During one of the City Council discussions, I expressed staff's concerns regarding the unlikely completion of the project in a timely manner. As was discussed at several City Council meetings, the two major developers of Naperville Crossings had disagreement regarding which contractor should be hired to complete some of the public improvements and specifically, the re-grading of the dirt pile. With the City Council's concurrence, staff indicated that there were too many concerns about awarding the contract to either of the contractors recommended by the different developers. In accordance with the city's purchasing practices, and since the city was still holding the cash deposit from the developer, the City Council directed staff to seek competitive bids and award a contract based on qualifications and price. Clearly, a construction firm experienced in re-grading must be in charge of this project. In this specific case, the two developers of Naperville Crossings had a significant difference of opinion regarding how the dirt pile was created, including an allegation by one of the developers that the other developer had trespassed and illegally buried asphalt underneath the dirt pile, so, logically, the city did not want to have either of the developers or contractors directly involved in the dispute decide which company would re-grade the stockpile of dirt. The City Council concurred.

The day after the City Council's decision to competitively bid the project, Councilman Furstenau called a city department director and demanded that the contractor previously rejected by city staff and preferred by one of the developers, be allowed to participate in the bidding process. Councilman Furstenau stated that he would make sure staff had this company's qualifications and he would deliver the RFP to the contractor. Although the City Council and staff were fully aware that this contractor was not qualified, Councilman Furstenau went directly to staff to forcefully insist that this contractor be invited into the process.

5. At a City Council meeting on April 4, 2006, Councilman Furstenau took exception with the purchase of two backhoe loaders and one front end loader used by the city for street and utility maintenance work. The City Council approved the bid. Since Councilman Furstenau's opinion did not prevail at the meeting, he accused city staff of "steering" the bids. Despite urging from a fellow councilmember, Councilman Furstenau refused to apologize for his defamatory statement. Rather, Councilman Furstenau chose to stand by his allegation of criminal wrong doing and has never offered any measure of proof that city staff was engaged in "steering."

The impact of this public abuse and defamatory accusations against city employees is enormous. Employees in our purchasing team are highly ethical and rely on professional practices when spending public funds. Reckless charges by an elected official against a

member of our professional purchasing team have a long-term negative impact on employee morale, motivation and the individual's reputation and feelings of worth. Councilman Furstenau is indifferent to these concerns and refuses to accept responsibility for his actions.

6. On January 1, 2006, Councilman Furstenau initiated a confrontation with Officer Mike Hull. Officer Hull was enforcing a special event parking restriction that had been previously approved by the City Council, including Councilman Furstenau. In the days following the incident, the police department thoroughly investigated the allegation by Officer Hull that he was struck by an angry Councilman Furstenau. The evidence in the investigation was weighed by trained police supervisors, the DuPage County State's Attorney Office and a judge who issued a warrant for his arrest. The process of gathering facts and statements from witnesses is common and is intended to determine if the accusation is true and if specific charges should be filed.

   During the stipulated bench trial, Judge Pierce said, "First of all, there's no wrong or inappropriate behavior shown by Officer Hull. In fact, he probably demonstrated restraint."

   In the days following the incident, Councilman Furstenau stood in my office and stated to me that while he may have tapped Officer Hull with the back of his hand, he did not "hit him." With an expression of pride, Councilman Furstenau proceeded to tell me "if I had hit him, he would have known it."

7. In April 2003, Councilman Furstenau wanted to gain access to a race site off Diehl Road. Councilman Furstenau arrived at the race late and after the adjacent roads had already been closed, a closure that was approved by the City Council. Councilman Furstenau pulled his car up next to the police barricade at Route 59 and Diehl Road. Because the police enforced the road closure and did not let him and other cars through to the race site, Councilman Furstenau unleashed a barrage of profanity towards the patrol officers. Since the profanity was directed towards employees of the city by a councilman, one of the patrol officers filed a formal complaint with the police department and the fraternal order of police. I met with representatives of the FOP to discuss the complaint. In a separate meeting, I reviewed the complaint with Councilman Furstenau. Councilman Furstenau denied the allegations and stated to me that he quietly drove his vehicle to another location in an effort to gain access to the race site.

8. On several occasions, the City Council has discussed the zoning and illegal land uses on property owned by the late Mr. James Hackett, who owned property at 725 Spring Street. This property has been discussed by residents who have complained about the industrial/construction uses on property that was zoned residential. This property was also included in the recent Spring Street Land Use Study.

Approximately two years ago, the city's Code Enforcement and Zoning staff responded to a series of complaints and implemented decisions involving Mr. Hackett's property. Only after extensive research did the staff determine that the property was zoned for residential uses, not industrial. As such, many of the existing uses were illegal and inappropriate for residential zoning. In order to support Mr. Hackett, Councilman Furstenau repeatedly argued that this property, "has always been used for industrial," and that city staff was "ruining this man's livelihood." Eventually, the entire question of zoning was brought before the City Council. The City Council concurred with staff's analysis and decisions. Indeed, some Councilmen felt that city staff should have been even more aggressive in enforcing the residential zoning requirements and illegal industrial uses. Regardless of the council's action, Councilman Furstenau has continued to ignore the City Council's decision and repeatedly and aggressively badgered city employees regarding his opinion of the zoning and land uses. Just recently, Councilman Furstenau stated that he has been considering purchasing the property himself. What is particularly troubling to staff is that normally, Councilman Furstenau is aggressive about enforcing zoning and illegal uses on other properties.

For many years, Councilman Furstenau has demonstrated a pattern of verbal abuse and intimidation towards employees of the City of Naperville. As with many professions, we recognize that work sometimes requires the need to have "thick skin"; we have to live in a world where there is disagreement and emotions are sometimes shown. In these instances and others, however, Councilman Furstenau has attempted to get his way by resorting to baseless charges against employees. At the Municipal Center, employees know that if Councilman Furstenau doesn't get his way, he will invent charges against the employee which suggest that the employee is engaged in criminal or unethical behavior.

Councilman Furstenau's arbitrary accusations have typically been in the context of trying to influence or change a staff decision that is supported, and being pursued because of City Council direction, zoning, law, or purchasing procedures. In doing so, he has caused many employees to feel traumatized, intimidated, badgered and disrespected. On many occasions, employees have stated to me that they believe Councilman Furstenau has infected the work environment with political influence that depletes our professional integrity.

At least six times, I have had personal conversations with Councilman Furstenau about his behavior towards employees. He either denies or minimizes the complaint. In one instance, only after I brought it to the attention of the City Council did Councilman Furstenau actually meet with a group of employees and he attempted to express some remorse. The effort was short-lived; Councilman Furstenau's accusatory style and threats towards employees' careers continues—even in recent weeks.

All prior attempts to correct Councilman Furstenau's behavior have failed. Therefore, I wrote this memo as a final effort to support Naperville employees, and ask Mayor Pradel, other Councilmen, and all directors to continue to do the same. Since our efforts to work with

Mayor, City Council
Director Leadership Team
November 30, 2007
Page 7 of 7

Councilman Furstenau behind the scenes and directly with him have failed, I believe the matter needs to be discussed in public.

*Peter T. Burchard*

Peter T. Burchard

PTB:nd

# Naperville

VIA EMAIL and FACSIMILE

December 6, 2007

Mr. Shawn Collins
The Collins Law Firm
1770 North Park Street, Suite 200
Naperville, Illinois 60563

    Re:   Your letter of December 5, 2007.

Dear Mr. Collins:

Please confirm that you have been retained and are representing Councilman Furstenau in matters beyond the scope of his federal lawsuit. To the extent that your letter concerns your lawsuit, you are aware that the City of Naperville is represented by outside counsel, and all communications with the City concerning that lawsuit should be directed to those attorneys. I will respond to your letter under the assumption that it is outside the scope of your current lawsuit.

Your letter is a transparent and ill-considered attempt to maneuver the City into some position of legal culpability for Peter Burchard's letter to the public expressing his opinions and disclosing undisputed circumstances involving your client. I remain mystified and disappointed at Councilman Furstenau's continued efforts to institute and threaten litigation against the City which, despite its obvious lack of merit, will cost the City hundreds of thousands of dollars in outside legal bills, as well as embroil city employees in distracting litigation when they should be serving the citizens. I hope your client is seeking your advice regarding his ability to vote on the City's agreement with Peter Burchard in light of conflicts laws.

Likewise, Councilman Furstenau's decision to share confidential personnel documents with you is disheartening. Your public command to me to disclose information and documents that are protected from public dissemination by well-established law reflects your naïve or manipulative approach. I will continue to handle personnel issues confidentially in accordance with the law and to protect the privacy interests at stake. Your pejorative characterization of the documents as "secret" is unprofessional and inflammatory. As your client is fully aware, the City's agreement with Peter Burchard will be presented on a City Council Agenda.

# Naperville

Shawn Collins
December 6, 2007
Page 2

Additionally, your characterization of Mr. Burchard's memo as "Smearing" Councilman Furstenau is unfortunate; you and your client should know that the memo reflects undisputed situations for which there is a plethora of documentation and witnesses.

Moreover, your suspicion that the Council's direction Tuesday night to staff to draft a censure resolution was a violation of the Open Meeting Act is simply wrong. The statute, case law, as well as routine procedures across the state at City Council Meetings would help you to correct your mistake. This is information you could have discovered through a little basic research or briefly consulting any attorney who is well versed in municipal law. These types of reckless accusations against Naperville staff are precisely what Mr. Burchard was referencing in his memo detailing a history of such abusive tactics. I would have thought that an attorney who purports to act on Mr. Furstenau's behalf might counsel against such tactics, rather than duplicate them.

Cordially,


Margo L. Ely
City Attorney


c:   via email to the following:
     Mayor A. George Pradel
     City Council
     Peter T. Burchard, Former City Manager
     Robert W. Marshall, City Manager Pro Tem
     Jake Griffin, Daily Herald
     Kate Houlihan, Naperville Sun



# Naperville Fraternal Order of Police
# Lodge No. 42

1163 E. Ogden Ave.
Suite 705 PMB 308
Naperville, Illinois 60563-8535
(630) 820-8392

To: Mayor George Pradel, Naperville City Council, Naperville Sun, Daily Herald, Beacon News, Chicago Tribune, Chicago Sun Times

From: Joe Matchett, President, Naperville Fraternal Order of Police Lodge #42

Date: December 10th, 2007

Subject: Open Letter


With the recent news articles relative to the Police Officers of the Naperville Police Department and the arrest of Richard Furstenau, I would like to comment as the President of the Naperville Fraternal Order of Police Lodge 42 which represents the Patrol Officers of the Naperville Police Department.

I would like to thank the outgoing City Manager, Mr. Peter T. Burchard who possesses great leadership skills, integrity, and a professional outgoing personality.

Mr. Burchard has confronted Richard Furstenau about his demeaning interaction with Naperville public employees and it has been brought to the attention of the Mayor as a result.

Richard Furstenau has, on several occasions, confronted police officers while they were performing their duties. I have personally been questioned by him while in the performance of my police duties. I am not the only police officer that he has confronted. These confrontations have ranged from confronting a police officer regarding the police closure of a City street to confronting police officers who were involved in towing cars from a tow zone. During such confrontations, Richard Furstenau has used profanity against the officers in public and on one occasion made physical contact with the officer which led to Richard Furstenau's arrest.

While criminal charges were pending, Furstenau remained on the City Council and voted on matters involving the Police Department including the budget and other business relative to the operations of the Department.

Most recently, Richard Furstenau has filed a baseless lawsuit against the City of Naperville and the Naperville Police Department while still maintaining his position on the City Council and while still voting on matters presented to the City Council and on matters that profoundly affect the Citizens of Naperville and the Naperville employees he is suing. In my opinion his continuation as a City Council member is an obvious conflict of interest and that the only ethical thing for him to do is resign from his position and allow the employees and the City to move forward in their diligent and professional manner. His continued presence on the City Council hinders this.

*Please note the phone number for the FOP Lodge has changed to: 630-554-0585