## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **RICHARD R. FURSTENAU,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 C 6143 |
| | ) | |
| **CITY OF NAPERVILLE**, a municipal | ) | The Honorable Charles R. Norgle |
| corporation; **MICHAEL HULL,** | ) | |
| in his individual and official capacity; | ) | Magistrate Judge Geraldine Soat Brown |
| **DAVID DIAL,** in his individual and official | ) | |
| capacity; **MICHAEL CROSS**, in his | ) | |
| individual and official capacity; | ) | JURY TRIAL DEMANDED |
| **PETER BURCHARD**, in his individual | ) | |
| and official capacity; **MARGO L. ELY,** | ) | |
| in her individual and official capacity, | ) | |
| and **JOE MATCHETT**, in his individual | ) | |
| and official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

RICHARD R. FURSTENAU, through his attorneys, Shawn M. Collins and John A. Sopuch III of The Collins Law Firm, P.C., for his Second Amended Complaint against CITY OF NAPERVILLE, OFFICER MICHAEL HULL, POLICE CHIEF DAVID DIAL, DETECTIVE MICHAEL CROSS, PETER BURCHARD, MARGO L. ELY and OFFICER JOE MATCHETT, states and alleges as follows:

## I.

## INTRODUCTION

Plaintiff Richard R. Furstenau is 63-years old, and a 30-year Naperville resident. He is a husband of 42 years; father of five children; grandfather of nine; a former high school football

and baseball coach; a retired business executive; a long-time Republican precinct committeeman; and a Naperville City Councilmember since 1999.

Beginning in January 2006, Defendants mounted *an orchestrated campaign to jail, silence and politically destroy Furstenau* because of the views he has expressed as a private citizen and as a Naperville City Councilmember, and more recently in blatant retaliation for his filing of this civil rights lawsuit and other criticisms he has expressed of his 2006 false arrest (described herein) by the City and Defendants Dial, Cross, Matchett and Hull.

**A.**

In January of 2006, the Naperville Police orchestrated the false arrest of their number one political enemy, Furstenau. Furstenau had infuriated the Police as, in previous years, he had:

- *Publicly castigated Police overtime pay practice, which has resulted in many City officers receiving overtime pay of one-third, or more, of their base salary, and more than 40 police officers being counted among the highest-paid City employees making more than $100,000 per year.*

- *Tried to ban "double-dipping" by retired Naperville police officers, i.e., the practice whereby a City police officer retires, begins collecting a City pension, and then returns to the full-time work force (at the City or elsewhere), drawing a second check.*

- *Loudly objected to Police use of taser guns against local citizens.*

- *Bluntly disagreed with the Police over their conduct which had led to citizen complaints and threats of legal action against the City.*

By January of 2006, Furstenau presented an even greater threat to the Police, as he had just announced his candidacy for the Illinois State Senate where, if elected, Furstenau promised to push for police "pension reform."

With this as the backdrop, on two occasions, on New Year's Day 2006, Furstenau questioned Officer Michael Hull—both times on a public Naperville street (Chicago Avenue), both times in front of perhaps hundreds of local residents who were making their way to watch

the New Year's Day Parade, and on the second occasion with one of Hull's supervisors just a few feet away—about what Furstenau believed to be Hull's improper towing of cars. Both conversations were brief and uneventful. Furstenau never hit Hull. Indeed, Hull obviously believed that Furstenau had done nothing wrong, as that day, ***Hull voiced no complaint to Furstenau; never said anything to the police sergeant who was with Hull when Furstenau came back the second time to find out why cars were getting towed; filed no complaint; made no arrest; and did not even fill out the "Incident Report" customarily prepared when an officer encounters possible criminal conduct***. Further, none of the numerous citizens who were milling around on Chicago Avenue that day waiting for a parade to start complained about or reported Furstenau's conduct. And no one, not a single person of the hundreds who had come to see Naperville's New Year's Day Parade, provide any support for Hull's fantastic account (unveiled for the first time days later) that Furstenau, then sixty-one years old, hit Hull so hard in the middle of the chest that he (Hull, a thirty-some year old police officer) was "so shocked" that he could "not immediately react." Instead, the eyewitnesses told the Naperville Police the opposite: that Furstenau never touched Hull.

Despite Officer Hull's dubious and uncorroborated story, and despite the fact that Hull's conduct—or more accurately, complete lack of conduct—belied Hull's account of the alleged forceful battery by Furstenau, days later, Police Chief David Dial ordered that a criminal "investigation" be undertaken, and it was. But just like Hull's unbelievable story, this investigation was a sham. ***Even before it started***, the Police had concluded that they would demand felony charges of "Aggravated Battery"—which carried a potential sentence of 15 years in prison—against Furstenau. Further, in the "investigation," the Police deliberately failed to

interview material witnesses, and ignored the statements of all witnesses (except Hull) who stated that they had seen no contact between Furstenau and Hull.

The investigation even featured the lead Police investigator, Detective Michael Cross (not an independent investigator, but a Naperville police officer himself), "re-interviewing" Hull for the purpose of letting his colleague know that his version of events did not mesh with what other witnesses had said about key events of January 1, ***and getting Hull to change his story*** so that it would better mesh with the stories of the other witnesses. And, indeed, Hull did change his story.

The sham nature of this "investigation"–and resulting battery charge against Furstenau– was finally proven by the fact that Officer Hull (the lone witness claiming Furstenau had hit him) ***did not even testify at Furstenau's trial***. Furstenau was acquitted of all charges, but the acquittal did not come until some 17 months after Hull and the Police had fabricated the bogus charge against Furstenau, and after substantial and irreparable damage had been done to Furstenau.

The announcement of Furstenau's arrest, leaked to the press by the Police, predictably blazed across newspaper headlines, throughout Naperville and across the region which Furstenau was seeking to represent. It severely damaged Furstenau's reputation, and ruined his campaign for the State Senate, as his opponent seized on the arrest and splashed it across his own campaign literature.

**B.**

After Furstenau was acquitted of the fabricated battery charge – which caused him to be booked, fingerprinted, and under prosecution for 17 months – and which wrecked his run for State Senate, Furstenau sought the disciplining of two of the officers (Defendants Cross and Hull) responsible for his false arrest. He also circulated a letter requesting from the City of

Naperville (1) an apology for the false arrest; (2) compensation to repay the many people who had contributed to his State Senate campaign (which was doomed following his public false arrest); and (3) that he be reimbursed for the legal fees that he was forced to pay to defend himself in the bogus criminal case that had been initiated against him.

Furstenau's requests were rejected. Therefore, having no choice but to either leave unaccountable those Defendants who had caused his false arrest, or seek redress in the courts, Furstenau filed this lawsuit.

Even though Furstenau's public complaints about his false arrest, his requests for accountability, and his filing of this lawsuit are all First Amendment-protected speech, Defendants City of Naperville, Burchard, Ely and Matchett decided to retaliate against him for it. Accordingly, they embarked upon an orchestrated campaign of political harassment, which *inter alia*:

- used City resources to selectively investigate Furstenau, with no lawful purpose;

- used City resources, selectively and with no lawful purpose, to search Naperville police records for those which may relate to Furstenau and then to publish them;

- directed the filing of multiple false complaints against Furstenau by City employees and others;

- falsely accused Furstenau of using his councilmember's position for "personal gain" and to "promote his private enterprise";

- selectively enacted a City ordinance with the intent that it would be selectively enforced against Furstenau;

- selectively enforced City ordinances against Furstenau;

- prohibited Furstenau from speaking on important public issues at City Council meetings;

- threatened continued selective use of City resources to investigate, and orchestrate the filing of complaints against, Furstenau; and

- otherwise engaged in a campaign of petty harassment ("Campaign").

As one Naperville City Councilmember has already publicly admitted, these actions are in apparent "retribution" against Furstenau for his filing of this civil rights complaint. This lawsuit is thus necessary to hold Defendants responsible for their conduct – both their 2006 false arrest of Furstenau, and their later retaliation against him when he tried to speak out against it.

## II.

### PARTIES

1.     Plaintiff Richard R. Furstenau is 63-years old, and a 30-year Naperville resident. He is a husband of 42 years; father of five children; grandfather of nine; a former high school football and baseball coach; a retired business executive; an active participant in local Republican politics; and a Naperville City Councilmember since 1999.

2.     Defendant City of Naperville is, and at all times relevant to the allegations in this Second Amended Complaint has been, a municipal corporation; the City of Naperville Police Department is a department within the municipal corporate structure of the City of Naperville.

3.     Defendant Michael Hull is, and at all times relevant to the allegations in this Second Amended Complaint has been, acting under color of state law as an officer for the Police Department of the City of Naperville.

4.     Defendant David Dial is, and at all times relevant to the allegations in this Second Amended Complaint has been, acting under color of state law as the Chief of Police for the City of Naperville.

5.     Defendant Michael Cross is, and at all times relevant to the allegations in this Second Amended Complaint has been, acting under color of state law as an officer for the Police Department of the City of Naperville.

6.      Defendant Peter Burchard was the City Manager of the City of Naperville until approximately December 7, 2007, who thereafter served–and continues to serve–as a consultant to the City, who took the actions complained of herein while he acted under the color of state law as the City Manager of Naperville.

7.      Defendant Margo Ely is counsel to the City of Naperville.  Ely took the actions complained of herein while she acted under the color of state law as counsel to the City.

8.      Defendant Joe Matchett is, and at all times relevant to the allegations in this Amended Complaint has been, acting under color of state law as an officer for the Police Department of the City of Naperville.

### III.

### JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. § 1331 because this case arises under the laws of the United States of America, and specifically alleges violations of the Fourth and Fourteenth Amendments to the United States Constitution, brought pursuant to 42 U.S.C. § 1983.

10.     This Court has supplemental jurisdiction over the Illinois state law claim set forth in Count IV, pursuant to 28 U.S.C. § 1367, as that claim involves substantially overlapping evidence and witnesses, involves the same events or connected series of events, and is otherwise so related to the Plaintiff's federal question claims that they form part of the same case or controversy under Article III of the United States Constitution.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because this case arises out of actions that occurred within this Judicial District.

## IV.

## ALLEGATIONS OF FACT

### Furstenau Has Repeatedly Angered the Police
### Through his Consistent Criticism of Police Pay and Practices

12.    Furstenau has regularly inflamed both the leadership and rank-and-file of the City of Naperville City's Police Department through the expression of his personal opinions and viewpoints, as a private citizen and longtime Naperville resident, which repeatedly and openly accused the Police of abusive pay (particularly overtime pay) practices; criticized "double-dipping" for retired City police officers; disagreed with the Police over "pet" Police projects; and opposed the Police's handling of cases of alleged Police misconduct.

### Furstenau Accuses the Police of Abuse of Regular and Overtime Pay

13.    Beginning in May 1999, Furstenau has demanded to examine a listing of the City's 100 highest-paid employees.  Furnished to him annually, this list now has a City-conferred title which associates the issue exclusively with Furstenau, i.e., "Per City Councilman Furstenau's Request."

14.    Nearly every year, Furstenau has noticed an increase in the number of police officers appearing on the list, to the point where, in 2006, almost half of the City's 100 highest-paid employees are members of the Police Department.  Each of these police officers made more than $100,000 in 2006.  Moreover, in many of these instances, the officer received overtime pay in excess of $25,000, and frequently the overtime pay amounted to 33%, or more, of the officer's total compensation.  This has led to the fact that, of total 2006 overtime pay to all City employees of some $7 million, approximately $5 million of that was paid to its police officers.  All of this and more has prompted Furstenau to carefully examine—and sharply criticize—how

the City's police are paid, and particularly to criticize Police Department practices concerning overtime pay.

15.    During this scrutiny, Furstenau has learned that the more senior officers within the Police Department have virtually unlimited access to their choice of overtime hours, at a pay rate of one and one-half times regular pay. Furthermore, he has learned that overtime pay is often "retroactively" approved, i.e., approved only after it has been worked by the (typically more senior) officers, without examination in advance as to whether the overtime is reasonably required.

16.    Furstenau has been critical of these Police practices because they are expensive not only in the fiscal year in which the police overtime is paid, but also because they continue to cost the City for many years into the future. Overtime paid this year, for example, is figured into the police officer's base pay for purposes of determining his/her pension which will be paid upon the officer's eventual retirement. This has the obvious result of driving up for years into the future pension costs to the City and the taxpayers.

### Furstenau Criticizes "Double-dipping" by Retired City Police Officers

17.    Another of Furstenau's vocal and repeated criticisms of practices within the City and Police Department is that there is no prohibition against "double-dipping" by a retired City police officer. In other words, a City police officer may retire from service to the Police Department and collect a pension for past service, and at the same time re-enter the work force on a full-time basis for the City or some other municipal employer. If the retired officer does so, then he or she is permitted to receive two checks from the City, i.e., one for the pension, and the other for the subsequent job. On numerous occasions, Furstenau has objected to this practice by the City Police.

**Furstenau Disagrees with the Police over "Pet" Police Projects**

*Taser "Stun" Guns*

18.     About four years ago, Furstenau began strongly objecting to the Police Department's desire to equip all of its officers with taser "stun" guns.  Having seen reports from around the country regarding citizens who had been killed or severely injured as a result of being shot with police taser guns, and concerned about the possibility of taser gun misuse by the Naperville Police, Furstenau did not want City police to have such guns, and said so repeatedly and vocally at, among other forums, City Council meetings.  His strongest concern centers on individuals who are shot multiple times by a taser gun—because that is where the highest incidence of fatalities occurs.

19.     Furstenau lost this dispute with the Police, and, as a result, many, if not all, of the City's police officers now have taser guns.

20.     Nevertheless, Furstenau continues to closely monitor for possible taser gun abuse by City police, and continues to object to the police having them.  His monitoring includes his requesting, and reviewing, data on the Police Department's use of tasers.  In this work, Furstenau has uncovered—and voiced concern over—what he considers to be a disturbing increase in the number of times that City police officers have shot citizens with taser guns multiple times.

*Police-directed Towing*

21.     Last year, before the City entered into a new towing contract, the Police Department presented the City Council with its desired version of the new contract.  Furstenau was not in favor of the Police-drafted version of the contract and publicly said so.  Furstenau felt the contract that the Police had drafted gave the Police far too much discretion as to which cars could be towed, who would tow these cars, and to which destination these cars would be towed.

22.    So, in an effort to reign in what he perceived as unfettered police discretion in the towing of cars, Furstenau and other City Council members revised the draft towing contract that the Police had presented to the City Council.  This revised towing contract diminished Police discretion, while strengthening the accountability to the City of towing companies.  The revised version of the contract eventually prevailed.

*Seat-belt law*

23.    Several years ago, the Naperville Police Department came to the City Council and strongly urged the passage of a City ordinance which would make it illegal to drive in or through the City unless every occupant in a vehicle was wearing a seat-belt.  Furstenau and other City Councilmembers effectively prevented the Department from obtaining their desired seat-belt ordinance.

24.    Although Furstenau strongly supported the safety concerns associated with such an ordinance, he felt that the only responsible way to address the problem was through a comprehensive, state-wide law requiring motorists to wear seat-belts, and not through piecemeal, city-by-city legislation.  Furstenau and other City Councilmembers played an important role in the state legislature's decision to pass a state-wide seat-belt law.

25.    However, prior to the passing of a state-wide law, Furstenau wrangled for years with the Police during City Council meetings by openly questioning the veracity of the Police Department's concern for the safety of motorists. Furstenau suspected, and vocalized his concern, that the true motivation behind the Police's ardent support of the seat-belt law was a desire to increase police officers' ability to randomly pull over otherwise law abiding citizens. As he publicly stated, Furstenau did not want to pass an ordinance which gave the Police a blank

check to sit at the border between, for example, Aurora and Naperville, selectively pulling over certain individuals under the guise of motor safety.

### Furstenau Disagrees with Police over the Department's Handling of Internal and External Allegations of Misconduct

26.    The City Council typically addresses both internal and external claims of police misconduct in closed council sessions, known as "executive sessions"—the contents of which are insulated from the press and Naperville's citizens.

27.    These "executive sessions" include the City Council's deliberation on settling claims of police misconduct leveled against the City.  During these deliberations (of which the Police Department are fully aware) on external, as well as internal, allegations of police misconduct, Furstenau has been a vocal and outspoken critic of the Department's leadership and supervision of its officers.  At times, Furstenau has demanded that the Department settle claims of misconduct asserted against officers and the City that the Police strongly desired to fight in court.  On several of these occasions, Furstenau has been the only member of the City Council to voice any objection at all.[1]

### The Naperville Police Bring False Charges Against Furstenau, in Retaliation for His Past Disputes with the Police, and to Derail Furstenau's State Senate Campaign

28.    In late 2005, Furstenau became an even bigger threat to the Police when he decided to run for State Senator.  One of the platforms of Furstenau's Senate campaign was "police pension reform."  Had he been elected to the State Senate, Furstenau publicly stated that he fully intended to pursue legislation which would prevent the previously-discussed "double

---

[1]    Due to the confidential nature of these matters, the specific details of the disputes between Furstenau and the Police Department will not be alleged here, but rather will be disclosed as required by applicable rules and Court order.

dipping" that is such a lucrative practice for police officers, yet a serious drain on municipal budgets.

29.    To combat this threat posed by Furstenau's run for State Senate, and to retaliate against Furstenau for his longstanding and relentless criticism of the Police, on January 18, 2006, the Police arrested Furstenau, in the absence of probable cause, and based upon fabricated charges.  The arrest was based upon the false accusation that, in broad daylight on January 1, 2006, with Naperville's New Year's Day Parade about to start and, thus, with hundreds of people milling around, Furstenau punched a uniformed City police officer, Defendant Michael Hull, in the chest while he was standing on a public street in Downtown Naperville.  Furstenau did no such thing.

30.    On January 1, 2006, Furstenau was in the downtown area of Naperville, Illinois, waiting to march in Naperville's New Year's Day Parade.  Prior to the parade, at about 4:15 to 4:30 p.m., Furstenau was walking toward the starting point of the parade, when he observed a nearby commotion. What Furstenau observed was several individuals yelling at Officer Hull, as Hull was ordering the towing of multiple vehicles located on Chicago Avenue.

31.    Furstenau approached Officer Hull to inquire into why the cars were being towed away.  Hull responded that the cars were in a designated tow zone which, although it may have been, had not been timely identified as such.  Furstenau was unsatisfied and baffled by Hull's response, and he left the scene continuing to walk toward the start of the parade.

32.    Approximately twenty to thirty minutes after his brief conversation with Hull, Furstenau had a second conversation, this time with Hull and Hull's supervisor, Sergeant Steven J. Schindlbeck.  Again, Furstenau asked both officers why cars on Chicago Avenue had been, and were being, towed, and when the "Do Not Park" signs had been put up.  Neither Hull nor

Schindlbeck could provide a satisfactory answer to either question.  On neither the first nor this second occasion, did Furstenau punch Hull; nor did he touch Hull.  Further, while Furstenau was standing right in front of him, at no time did Hull inform his supervisor Schindlbeck that Furstenau had, just minutes before, punched him in the middle of the chest so hard that it had "shocked" Hull.  Indeed, when Schindlbeck was "interviewed" as part of the Police Department's "investigation," Schindlbeck said nothing (not a single word) about Furstenau punching, hitting or touching Hull.

33.    After getting no answers to his questions from Hull and Schindlbeck, Furstenau left the area.

34.    At no time on that day did Officer Hull or Sergeant Schindlbeck complain to Furstenau about Furstenau's behavior, let alone warn, state or even suggest to Furstenau that he had done anything that might subject him to arrest.  Indeed, Officer Hull did not arrest Furstenau that day, and did not even hint that he might.

35.    Neither did Officer Hull prepare on that day any of the documentation required of a City police officer when that officer has concluded that criminal – or even unusual – activity may have occurred.  Officer Hull on that day filed no complaint, and prepared no "Incident Report" or memorandum of any kind.

36.    Approximately four (4) or five (5) days after his interaction with Officer Hull, Furstenau learned from a fellow City Councilman that the Police were investigating him for allegedly battering Hull.  This stunned Furstenau, as he knew he had done nothing of the kind, and indeed had heard no complaint from Officer Hull, any other officer or anyone concerning his behavior.

### The "Investigation" into Furstenau's Encounter with Hull
### was Pre-Determined to Bring Charges Against Furstenau from the Outset

37.    Obviously believing that Furstenau had committed no crime during their encounter on January 1, Officer Hull completed his shift that day, and returned home. He did not seek medical attention for any alleged physical altercation he had experienced. He did not go to Police headquarters to prepare any complaint or report as to anything unusual that may have happened that day.

38.    Nevertheless, on or about January 3, Naperville Police Chief Dial – with whom Furstenau had often had disagreements about Police matters (such as those described above) – determined that an "investigation" of Furstenau's conduct should be undertaken.

39.    Accordingly, Police Chief Dial appointed Naperville Police Detective Michael Cross (whom, ironically, Dial later described to Furstenau as the Police's "best man") to head the kangaroo "investigation."    Chief Dial remained in charge of the "investigation" throughout; stayed in close contact with Detective Cross concerning the investigation's progress; provided Cross with "witnesses" to interview and either approved the seeking of what he knew to be unjustified criminal charges against Furstenau at the conclusion of the "investigation," or recklessly disregarded the fact that there was no lawful basis to bring such charges. Indeed, why the sitting Chief of Police was so involved in the "investigation" into Furstenau is telling.

40.    The "investigation" was a sham, calculated to bring unwarranted charges against Furstenau. This is demonstrated, *inter alia*, by the following:

(a)    Even before the "investigation" began, Detective Cross and the Naperville Police Department had concluded that they would seek felony charges for "Aggravated Battery" against Furstenau. (The DuPage County States Attorney refused to bring "Aggravated Battery" charges and so, more than two weeks after the alleged battery took place, Cross and Hull personally secured from a DuPage County Judge an arrest warrant for misdemeanor charges based on a false statement which Hull signed "on oath" and which

contained materially different information than what Hull had told Cross when Cross first "interviewed" Hull.)

(b)   Despite the fact that Officer Hull on January 1 had plainly concluded that Furstenau had committed no crime–as he had made no arrest, filed no complaint, and prepared no "Incident Report"–on January 3, Chief Dial instructed Officer Hull and others to prepare internal memoranda of the January 1 "events." No other police officer that Dial asked to prepare an "Incident Report" saw Hull get punched, hit, or touched by Furstenau. Moreover, the senior officer to whom Hull claimed to have reported Furstenau's forceful battery did not even bother to submit an Incident Report or prepare any statement whatsoever. As of today, there is no evidence that that officer was ever even interviewed.

(c)   On January 3, 5 and 6, Officer Hull wrote and told his version of the "events" of January 1. While these re-tellings by Hull were *less than one week after* the supposed battery by Furstenau–and thus, one would think that a trained professional like Officer Hull should have had his clearest memory–Officer Hull's thrice-told version described things that did not happen, and could not have happened. For example, Hull was in error by almost two hours as to the time of the alleged crime. Officer Hull three times reported that his exchange with Furstenau occurred at 2:50 p.m., when Furstenau was nowhere near Officer Hull or even in the area where he claimed that Furstenau had punched him. Officer Hull was also in error about the Downtown Naperville building from where Furstenau emerged just before the alleged "crime."

(d)   These material errors should have halted any investigation, and certainly any thought of pressing felony charges. They did not. Instead, Detective Cross re-interviewed Officer Hull, and told him what other witnesses had said about the time when Furstenau and Officer Hull had briefly been together on January 1. As a result of this re-interview, Officer Hull "corrected" his version of events, and agreed to a timeline which Detective Cross had suggested to him, and described as "more consistent" with that offered by other witnesses.

(e)   Of the approximately ten witnesses interviewed in connection with the "investigation," only one–Officer Hull–stated that Furstenau had hit him. All others either denied that Furstenau had done any such thing, stated that they saw no such contact, or were otherwise unable to support the pre-determined "Aggravated Battery" charge that the police had come up with. Accordingly, the only witness alleging Furstenau had hit Officer Hull was Hull himself–who had failed to make any arrest, voice any complaint, or prepare any report of physical contact allegedly so serious and forceful that it had "shocked" Hull and constituted felony "Aggravated Battery," and who, in the three reports he subsequently offered at the behest of

Chief Dial, could not even get the time right, and thus had to be told to change his story.

(f)    Police Chief Dial personally invited Furstenau to be interviewed by Detective Cross in connection with the "investigation." Furstenau consented to be interviewed by Cross, and did not even bring a lawyer with him. Furstenau answered all of the Police's (and Detective Cross's) questions, including making a vigorous denial of any allegation that he had ever hit Officer Hull. However, Chief Dial did not inform Furstenau that, well before the interview, his Police Department had already decided to charge Furstenau with felony "Aggravated Battery."

(g)    When asked by Detective Cross if he could provide any witness who saw what happened between Furstenau and Hull, Furstenau gave Detective Cross two names. Cross interviewed both witnesses and both (who were just a few feet from Furstenau and Hull when Furstenau allegedly punched Hull) refuted Hull's ridiculous version of events. Unbelievably, Cross, the Department's "best man" did not ask either of the witnesses whether they had seen Furstenau punch, hit or touch Hull.

41.    Despite glaring holes in Officer Hull's account of the incident, despite the lack of any witness who could corroborate the alleged battery, despite the fact that Hull's account had been refuted and despite the failure to properly interview all individuals who witnessed the "incident," on January 17, 2006, Detective Cross spoke with Assistant State's Attorney Jennifer Piccione and demanded that felony charges be brought against Furstenau. This request was denied. Undeterred, on that same day (just hours after the denial by Prosecutor Piccione), Officer Hull and Detective Cross went to the DuPage County Courthouse and obtained an arrest warrant for Furstenau.

(a)    Further, upon information and belief, despite knowing that there was no lawful basis for the arrest of Furstenau, or recklessly disregarding the fact that there was no lawful basis, Defendant Matchett—then the President of the union of Naperville Police—and Defendant Dial pressured Defendant Hull into signing the complaint that initiated the false arrest of Furstenau. Upon information and belief, Hull signed the complaint because of this pressure, despite knowing that doing so had no lawful basis, and despite the fact that he did not want to do it.

42.    City of Naperville Municipal Code Section 1-8A-2 states, "The chief shall be responsible for the performance of the police department, and all persons who are members of the department shall serve subject to his orders." As a result, *inter alia*, of this ordinance, Chief of Police Defendant Dial is the individual at the City of Naperville with final policymaking authority with respect to the initiation and maintenance of the sham investigation into Furstenau's encounter with Defendant Hull, and with respect to the false arrest of Furstenau, as is more fully set forth in Paragraphs 38-41 of the Second Amended Complaint.

43.    The acts of Defendants Hull, Cross and Matchett, as set forth in Paragraphs 40 and 41 of the Second Amended Complaint, were performed at the behest of Defendant Dial, or with final policymaking authority delegated to them by Defendant Dial pursuant to, *inter alia*, City of Naperville Municipal Code Section 1-8A-2.

**Furstenau's Arrest Destroys His State Senate Campaign,
and Badly Damages his Reputation**

44.    Furstenau's arrest was the death knell for his chance to win the State Senate seat. Newspaper headlines which began on January 8, 2007, with a leak from Police gave the arrest a prominence that made it impossible for Furstenau's campaign to succeed. Indeed, the first wave of articles came out before Furstenau had been charged with anything and while the "investigation" by Cross was still ongoing. The story had clearly been leaked to the press by the Police Department.

45.    Furstenau's opponent made most of the headlines. The opponent's campaign literature reproduced stories of the news of Furstenau's arrest, and was circulated throughout the Senate district. The arrest was spotlighted as the reason to vote against Furstenau. To be sure, the stories about the "investigation" of Furstenau and his subsequent arrest were huge. Indeed,

in its end-of-the-year edition for 2006, the Naperville Sun reported that its readers had voted the story on Furstenau's arrest as the "top story of 2006."

46.     As a result, in a race where originally Furstenau had been given an excellent chance to win, he was ultimately defeated by a 60/40 margin.

47.     Unfortunately the damage did not stop with the election loss.     Furstenau's reputation within the Naperville community has been irreparably harmed, even despite his ultimate acquittal.

**Officer Hull Does Not Appear at Furstenau's Criminal Trial;
Furstenau is Acquitted**

48.     As the final proof that the charges against Furstenau were false, the only witness claiming Furstenau had hit Officer Hull–Hull himself–failed to testify in person at Furstenau's criminal trial.

49.     In May of 2007, the DuPage County Judge presiding over the criminal case found Furstenau not guilty of the battery that Hull had fabricated.

**Furstenau Seeks Redress for his False Arrest and
Defendants Retaliate By Subjecting Him to
Further Unconstitutional Actions**

50.     Between June and November, 2007, as a private citizen and not pursuant to his duties as a City councilman, Furstenau:

(a)     requested that Officer Hull and Detective Cross be disciplined for their involvement in his false arrest;

(b)     requested that he be issued an apology, and reimbursed $129,500, for having been falsely arrested;

(c)     after his requests were ignored and rejected, filed this civil rights lawsuit, alleging serious misconduct against the City and its police officers relating to his false arrest;

(d)   held a press conference, to announce the filing of this lawsuit, and to criticize police and the City's behavior involved in his false arrest; and

(e)   otherwise criticized the conduct of the police and the City in orchestrating his false arrest.

51.   Furstenau's speech and activity described in Paragraph 50 (collectively, the "Protected Speech") are Constitutionally-protected, specifically protected by the First Amendment to the United States Constitution.

52.   Motivated at least in part to retaliate against Furstenau for his exercise of the Protected Speech, Defendant City of Naperville and Defendants Burchard, Ely and Matchett embarked upon an orchestrated campaign of political harassment which, *inter alia*:

(a)   used City resources to selectively investigate Furstenau, with no lawful purpose;

(b)   used City resources, selectively and with no lawful purpose, to search Naperville police records for those which may relate to Furstenau and then to publish them;

(c)   directed the filing of multiple false complaints against Furstenau by City employees and others;

(d)   falsely accused Furstenau of using his councilmember's position for "personal gain" and to "promote his private enterprise";

(e)   selectively enacted a City ordinance with the intent that it would be selectively enforced against Furstenau;

(f)   selectively enforced City ordinances against Furstenau;

(g)   prohibited Furstenau from speaking on important public issues at City council meetings;

(h)   threatened continued selective use of City resources to investigate, and orchestrate the filing of complaints against, Furstenau; and

(i)   otherwise engaged in a campaign of petty harassment ("Campaign").

53.     Indeed, as one City council member has already publicly admitted, such actions have been undertaken in apparent "retribution" for Furstenau's exercise of the Protected Speech.

54.     Defendants' Campaign consisted of at least the following actions:

(a)     In concert with others, Defendants Burchard and Ely directed an investigation into Furstenau's conduct—as both a private citizen and councilmember—over (at least) the last five years, with the intent that this investigation would produce, without adequate regard to their truth, allegations that were specifically intended to intimidate, threaten, punish, embarrass and discredit Furstenau, and that such allegations would then be publicly disseminated.  No such investigation was undertaken as to any other councilmember, or indeed as to any citizen.

(b)     In concert with others, Defendants Burchard and Ely and, upon information and belief, Defendant Matchett, searched Naperville Police files for any complaints concerning Furstenau, and then publicly disseminated such records, in order to intimidate, threaten, punish, embarrass and discredit Furstenau.  No such search of Police files was undertaken as to any other councilmember, or indeed as to any citizen.

(c)     In concert with others, Defendants Burchard and Ely searched other City files for previously-created documents containing allegations deemed by Defendants to be embarrassing and humiliating to Furstenau.  No such search was undertaken as to any other councilmember, or indeed as to any citizen.

(d)     In concert with others, Defendants Burchard and Ely, with the intent to publicly humiliate, harass, embarrass and punish Furstenau, directed the submission by City staff—in October, November and December of 2007—of complaints containing allegations of Furstenau's conduct, some of which allegedly had occurred months and years earlier.  The only criteria for this memo preparation was that the memos contain allegations deemed to be intimidating, threatening, punishing, embarrassing complaints and/or discrediting to Furstenau.  Indeed, many of the allegations in these memos are false and no, or an inadequate, effort was made by Defendants to determine the veracity of the complaints before Ely and Burchard publicly disseminated them or their contents.  Indeed, Ely and Burchard even had the names of the authors and recipients of many of the complaints redacted, so that the veracity of the memos could not be determined.  No such complaint preparation was directed and no public dissemination of such complaints was undertaken as to any other councilmember, or indeed as to any citizen.

These actions resulted, for example, in the preparation and submission by City employees and public dissemination by Ely and Burchard of at least eleven such complaints against Furstenau between October 23, 2007 and December 11, 2007, including at least six of which were dated between December 7 and December 11.  These complaints included, for example, allegations of Furstenau misconduct in April of 2006 – in a complaint dated some *20 months later*, on December 10, 2007; allegations of Furstenau misconduct in November of 2006 – in a complaint dated some *13 months later*, on December 10, 2007; and allegations of Furstenau misconduct in April of 2007 – in a complaint dated some *8 months later*, on December 11, 2007.

(e)    In concert with others, Defendants Burchard and Ely directed, without Furstenau's knowledge, the preparation and submission by City staff of complaints concerning Furstenau's conduct at meetings which he attended in November and December of 2007, with the intent that such memos—if they described Furstenau's conduct deemed by Defendants to be sufficiently embarrassing and discrediting to Furstenau—would be publicly disseminated.  Many of the allegations in these complaints are false and no, or an inadequate, effort was made by Defendants to determine the veracity of the memos before Burchard and Ely publicly disseminated them.  No such ordered memo preparation was undertaken as to any other councilmember, or indeed as to any citizen.

(f)    In concert with others, Defendants Burchard and Ely ordered and personally implemented the public dissemination of complaints and other documents—including Naperville Police records—containing allegations deemed to be intimidating, threatening, embarrassing and/or discrediting to Furstenau, without adequate regard as to whether those allegations were true (and, indeed, many of the allegations were false).  No such action was taken as to any other councilmember, or indeed as to any citizen.

(g)    In concert with others, in November and December of 2007, Defendants Burchard and Ely ordered and personally implemented the public dissemination of allegations about Furstenau that were not only materially false, but which further purported to describe Furstenau's conduct that had occurred years earlier, e.g., April of 2003; July of 2003; July of 2005; September of 2005; and "approximately two years ago," and thus, as Ely herself admitted, could have no possible legitimate significance.  No such action was taken as to any other council member, or indeed as to any citizen.

(h)    Defendant Ely threatened, on at least two occasions, local businesspeople who had project(s) that required City approval and who were deemed by Ely to be sympathetic to Furstenau's position in this lawsuit, that, if they continued to support Furstenau, their project(s) would not receive the

required City Council approval. No such action was taken as to any other councilmember, or indeed as to any other citizen.

(i) In concert with others, Defendants Burchard and Ely orchestrated the passage, in September of 2007, of the first-ever ordinance in the 175-year history of the City of Naperville that allowed for the public censure of a City councilman, with the intent that such ordinance would be quickly invoked to punish Furstenau. (Indeed, as described below, Furstenau was censured – albeit illegally – pursuant to this new ordinance within 105 days of its enactment.) Never in the history of the City had it enacted an ordinance for the specific purpose of punishing the actions of a single private citizen, i.e., Furstenau engaging in the Protected Speech.

(j) In concert with others, Defendant Ely orchestrated and participated in secret meetings that unlawfully excluded Furstenau and the public from participating in debate on important public issues, in direct violation of their First Amendment rights, and in violation of the Illinois Open Meetings Act and the City's own ordinances. Such secret meetings, labeled as "Executive Sessions" on December 4 and 18, 2007, were noticed to the public as necessary for the exclusive purpose of the City's consideration of strategy in connection with its defense of this lawsuit, and thus excluded Furstenau and the public. In fact, however, these meetings illegally involved the participants' discussion of the use of the new censure ordinance as a means to intimidate, threaten, punish, embarrass and discredit Furstenau for his engaging in the Protected Speech, and included a discussion and agreement as to how various participants in these meetings would vote on censure, and even included the preparation of written statements that various participants would later read in public. Specifically:

(i) the December 4, 2007 "Executive Session" violated the First Amendment, Illinois Open Meetings Act, and City ordinances, *inter alia*, because it unlawfully excluded the public; included an unlawfully secret discussion about the punishment of Furstenau; and also because, despite no notice to the public whatsoever that action on censure would even be considered, action indeed did take place (i.e., a vote to draft a resolution of censure, after the City's Mayor Pradel read a written statement announcing his conclusion that Furstenau was guilty of alleged misconduct, consideration of which had not even been noticed for the public portion of the meeting).

(ii) the December 18, 2007 meeting violated the First Amendment, Illinois Open Meetings Act, and City ordinances, *inter alia*, because, while the censure of Furstenau had been explicitly noticed for consideration only during the public portion of that meeting,

censure was extensively discussed, and a vote thereon arranged, by the participants in that secret "Executive Session"—which excluded Furstenau and the public. Indeed, upon information and belief, in this illegal, secret "Executive Session," participants therein who indicated that they did not wish to support censure of Furstenau were threatened with retribution if they did not change their position and vote to censure Furstenau. Further, in that illegal "Executive Session," participants were told that a unanimous vote (not counting Furstenau's vote) on the censure of Furstenau was necessary to present a unified front of opposition to Furstenau in this litigation.

(k)    In concert with others, Defendants Burchard and Ely orchestrated the censure of Furstenau for allegations of his misconduct that were false and otherwise unproven, and for conduct not even forbidden by the City's new censure ordinance, but also without even affording Furstenau the opportunity to meaningfully confront the allegations against him. Indeed, when on December 18, 2007, Furstenau asked for the opportunity to "specifically" confront the allegations against him, he was denied, and instead a vote on his censure immediately taken. (As had been prearranged in the illegal "Executive Session" of December 18, the vote was 8-1 (Furstenau opposing) in favor of censure.) In this regard, Defendants selectively enforced the new censure ordinance that had been specifically enacted to censure Furstenau, and applied a different standard to Furstenau's conduct than it did to that of any other councilmember or citizen.

(l)    In concert with others, Defendant Burchard and Ely orchestrated the false accusations against Furstenau that he was using his councilmember's position for "personal gain" and to "promote his private enterprise." In this regard, Defendants Burchard and Ely, in concert with others, selectively invoked City ordinances to apply them to Furstenau, but to no one else.

(m)    In concert with others, Defendants Burchard and Ely orchestrated the censure of Furstenau, for his actions as a private citizen, i.e., engaging in the Protected Speech. In connection with this censure, Defendants applied to Furstenau different standards than were applied to any other councilmember or citizen.

(n)    In concert with others, Ely advocated the censure of Furstenau on the "strength" of evidence that she had yet to even have created. For example, while on December 10, 2007, Defendant Ely purported to convey to councilmembers all of the "evidence" she claimed to support Furstenau's censure, that "evidence" included at least two orchestrated complaints that had not even been written yet, as they were dated December 11, 2007.

24

(o)    In concert with others, Defendant Ely has researched and taken other steps to implement the recall of Furstenau from public office.

(p)    In concert with others, and with the intent to intimidate and threaten Furstenau, Defendant Matchett published a letter from the local union of more than 100 Naperville Police—which included two of those officers (Defendants Hull and Cross) who orchestrated the false arrest of Furstenau, and the records of which were searched in Defendants' above-described investigation into Furstenau—which falsely stated that Furstenau had been arrested in 2006 for "contact" with a police officer, and falsely accused Furstenau of misconduct with Police in other incidents.

55.    Defendants' retaliatory actions were intentional, punitive, deliberate, malicious, calculated and undertaken in bad faith.

(a)    As intended, Defendants' retaliatory actions have resulted in the direct deprivation of Furstenau's First Amendment rights to speak on matters of public significance, and to participate meaningfully in City government.

(b)    As intended, Defendants' retaliatory actions have unlawfully intimidated Furstenau in the exercise of his First Amendment rights, *inter alia,* in that he is now reasonably concerned that: the Naperville police – who orchestrated his "false arrest" in 2006 – will do so again; that his political opinions will continue to result in the filing of false complaints against him; that Defendants will continue to selectively use City resources to investigate him, and selectively enforce City ordinances against him; and that he is reluctant to invoke in this litigation all of the rights available to him.

56.    Further, Defendants' retaliatory acts are likely to chill a person of ordinary firmness from exercising his First Amendment rights and, as shown above and as intended, have in fact so chilled Furstenau.

## Count I

### 42 U.S.C. § 1983 – U.S. Const., Amend. IV Violation

57.    Plaintiff, repeats, re-alleges, and incorporates by reference paragraphs 1 through 56 as if fully set forth herein.

58.    Defendants Michael Hull, Detective Michael Cross, Chief David Dial, Joe Matchett and the City of Naperville are "persons" as that term is used in 42 U.S.C. § 1983.

59.    Furstenau was arrested and detained by Defendants without probable cause, in violation of his Fourth and Fourteenth Amendment rights.

60.    Defendants, acting under color of state law, proximately caused the deprivation of Furstenau's Fourth Amendment rights.

61.    Defendants' actions were undertaken in bad faith and either with the intent to deprive Furstenau of his rights, or with reckless and callous disregard for, and deliberate indifference to, Furstenau's constitutional rights.

62.    Defendant City of Naperville acted pursuant to an official policy, custom, or decision of an individual with final policy-making authority, and proximately caused the deprivation of Furstenau's Fourth Amendment rights.

## Count II

### 42 U.S.C. § 1983 – U.S. Const., Amend. XIV Violation

63.    Furstenau, repeats, re-alleges, and incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

64.    Defendants Michael Hull, Detective Michael Cross, Chief David Dial, Joe Matchett and the City of Naperville are "persons" as that term is used in 42 U.S.C. § 1983.

65.    Furstenau was arrested by Defendants without probable cause.

66.    In arresting Furstenau without probable cause, Defendants intentionally treated Furstenau differently from others similarly situated, in violation of Furstenau's Fourteenth Amendment right to equal protection under the law.

67.    Defendants' differential treatment of Furstenau was without rational basis, or based upon Defendants' wholly illegitimate animus toward Furstenau.

68.    Defendants, acting under color of state law, proximately caused the deprivation of Furstenau's Fourteenth Amendment rights.

69.    Defendants' actions were undertaken in bad faith and either with the intent to deprive Furstenau of his rights, or with reckless and callous disregard for, and deliberate indifference to, Furstenau's constitutional rights.

70.    Defendant City of Naperville acted pursuant to an official policy, custom, or decision of an individual with final policy-making authority, when it proximately caused the deprivation of Furstenau's Fourteenth Amendment rights.

<u>**Count III**</u>

**42 U.S.C. § 1983 – U.S. Const., Amend. I Violation**

71.    Furstenau, repeats, re-alleges, and incorporates by reference paragraphs 1 through 70 as if fully set forth herein.

72.    Defendants Michael Hull, Detective Michael Cross, Chief David Dial, Peter Burchard, Margo Ely, Joe Matchett and the City of Naperville are "persons" as that term is used in 42 U.S.C. § 1983.

73.    Furstenau was arrested by Defendants City of Naperville, Dial, Cross, Hull and Matchett without probable cause.

74.    In arresting Furstenau without probable cause, these Defendants were motivated by disapproval of Furstenau's long established history of vocal criticism of, and opposition to, the Naperville Police Department's base pay rates, overtime abuses, pension manipulation, and other behavior and practices.

75.　　The Defendants' arrest of Furstenau in the absence of probable cause and based upon fabricated charges was an effort to silence Furstenau's political viewpoints and vocal opinions.

76.　　Motivated at least in part to retaliate against Furstenau for his exercise of the Protected Speech, Defendant City of Naperville and Defendants Burchard, Ely and Matchett embarked upon an orchestrated campaign of political harassment which, *inter alia*:

    (a)　　used City resources to selectively investigate Furstenau, with no lawful purpose;

    (b)　　used City resources, selectively and with no lawful purpose, to search Naperville police records for those which may relate to Furstenau and then to publish them;

    (c)　　directed the filing of multiple false complaints against Furstenau by City employees and others;

    (d)　　falsely accused Furstenau of using his councilmember's position for "personal gain" and to "promote his private enterprise";

    (e)　　selectively enacted a City ordinance with the intent that it would be selectively enforced against Furstenau;

    (f)　　selectively enforced City ordinances against Furstenau;

    (g)　　prohibited Furstenau from speaking on important public issues at City council meetings;

    (h)　　threatened continued selective use of City resources to investigate, and orchestrate the filing of complaints against, Furstenau; and

    (i)　　otherwise engaged in a campaign of petty harassment ("Campaign").

77.　　Defendants, acting under color of state law, proximately caused the deprivation of Furstenau's First Amendment rights.

78.　　Defendants' actions were without justification, and motivated either to punish Furstenau with the intent to deprive Furstenau of his rights, or undertaken in bad faith and with

reckless and callous disregard for, and deliberate indifference to, Furstenau's constitutional rights.

79.     Defendant City of Naperville acted pursuant to an official policy, custom, or decision of an individual with final policy-making authority, when it proximately caused the deprivation of Furstenau's First Amendment rights.

### Count IV

### Malicious Prosecution

80.     Furstenau, repeats, re-alleges, and incorporates by reference paragraphs 1 through 79 as if fully set forth herein.

81.     Defendants City of Naperville, Dial, Cross, Hull and Matchett commenced or caused the continuation of a criminal legal proceeding against Furstenau.

82.     Defendants, through their charges and arrest of Furstenau, actively instigated the criminal proceeding against Furstenau.

83.     The criminal proceedings Defendants instigated were resolved in Furstenau's favor, on or about May 21, 2007, when he was found "not guilty," nearly two years after Furstenau announced he would be running for State Senator.

84.     Defendants lacked probable caused for the instigation of the criminal proceedings against Furstenau.

85.     Defendants acted with bad faith and malice in instigating, commencing, and continuing the legal proceedings against Furstenau.

86.     Furstenau suffered damages as a result of the criminal proceeding commenced by Defendants.  Furstenau's damages included, *inter alia*, criminal attorney's fees, humiliation, financial loss, and damage to his personal reputation and that of his family.

WHEREFORE, Plaintiff, Richard Furstenau, respectfully requests that this Court:

(a)    Enter an order in Plaintiff's favor;

(b)    Award Plaintiff compensatory damages in an amount to be determined by the trier of fact;

(c)    Award Plaintiff punitive damages, as allowed by law, and in an amount to be determined by the trier of fact; and

(d)    Award Plaintiff his reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1985; and grant Plaintiff such other and further relief as the Court deems appropriate.

Dated: January 28, 2008                    Respectfully submitted,
                                           **RICHARD R. FURSTENAU**


                                    By:    s/ Shawn M. Collins_____
                                           One of the Plaintiff's Attorneys

Shawn M. Collins
John A. Sopuch III
Edward J. Manzke
Aaron W. Rapier
THE COLLINS LAW FIRM, P.C.
1770 N. Park Street, Suite 200
Naperville, Illinois  60563
(630) 527-1595
(630) 527-1193 – Fax